*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0217p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

    No. 04-4540

LUMMIE SANDERS,

        *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 93-00184—David D. Dowd, Jr., District Judge.

Submitted: October 27, 2005

Decided and Filed: June 29, 2006

Before: MARTIN, GIBBONS, and GRIFFIN, Circuit Judges.

———————————

## COUNSEL

**ON BRIEF:** Alan C. Rossman, Cleveland, Ohio, for Appellant. Bruce A. Khula, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

    GIBBONS, J., delivered the opinion of the court, in which GRIFFIN, J., joined. MARTIN, J. (pp. 10-19), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

    JULIA SMITH GIBBONS, Circuit Judge. The case before us originated in 1993, when defendant-appellant Lummie Sanders was convicted of two firearm offenses and sentenced to 37 months imprisonment. Seven years later, following two direct appeals and one appeal of a motion under 28 U.S.C. § 2255, this court determined that Sanders should be sentenced to the 180-month minimum mandated by the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(1). By this time, however, Sanders had been released from custody because the 37-month sentence the district court imposed in granting the § 2255 motion, the same sentence imposed in Sanders' first sentencing, had been completed. Four more years passed before the district court issued a warrant for Sanders' arrest and imposed the longer sentence. Sanders claims that this delay violated his constitutional right to due process. As we find no due process violation, we affirm the sentence imposed by the district court.

1

I.

Sanders was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and for making a false statement in acquiring a firearm in violation of 18 U.S.C. § 922(a)(6). The jury found Sanders guilty on all counts, and the government requested the fifteen-year minimum sentence mandated by the ACCA, as Sanders had three previous convictions for violent felonies: (1) a 1968 conviction for robbery; (2) a 1972 conviction for assault with a dangerous weapon; and (3) a 1986 conviction for involuntary manslaughter.

Before sentencing, Sanders challenged the constitutionality of his 1968 and 1972 convictions. The district court ruled that the 1972 conviction was constitutionally infirm. This ruling made the ACCA inapplicable to Sanders and the court sentenced him to 37 months imprisonment in December 1993. On appeal, a panel of this court upheld the § 922 convictions but remanded for reconsideration of the sentence. *United States v. Sanders*, Nos. 93-4322 & 94-3031, 1994 WL 714377, at *3 (6th Cir. Dec. 22, 1994) (per curiam). The court ruled that under *Custis v. United States*, 511 U.S. 485 (1994), the district court should have considered the 1972 assault conviction in its determination of whether to sentence under the ACCA; however, the court asked for a further ruling on whether the 1986 involuntary manslaughter conviction counted as a predicate felony under the ACCA. *Id.* at *2-3.

On remand, the district court determined that involuntary manslaughter was a violent felony for the purposes of the ACCA, and thus, the statutory minimum sentence must be imposed. After applying a Guidelines enhancement, the court sentenced Sanders to 188 months in prison. Sanders appealed, and a panel of this court agreed with the determination that the ACCA applied. *United States v. Sanders*, 97 F.3d 856, 860-61 (6th Cir. 1996). The panel disagreed, however, with the district court's ruling that it lacked authority to grant a downward departure under the Sentencing Guidelines, and the case was remanded once again for resentencing. *Id.* at 861-62.

In July 1997, the district court resentenced Sanders to the minimum permitted by the ACCA – 180 months imprisonment. Sanders then filed a motion to vacate under 28 U.S.C. § 2255, arguing that *Custis* did not foreclose him from attacking his predicate convictions and that his 1972 assault conviction was constitutionally infirm. The district court accepted both of these arguments and resentenced Sanders to the original term of 37 months in April 1998. As Sanders had already served 37 months, he was released from custody.

The government once again appealed, and in 1999, this court reversed the grant of habeas relief, ruling that *Custis* prevented Sanders from using § 2255 to attack a state court conviction. *Sanders v. United States*, No. 98-3651, 1999 WL 591455, at *2 (6th Cir. July 27, 1999). Sanders' petition for rehearing was denied in January 2000 and the Supreme Court denied *certiorari* in March 2000. *Sanders v. United States*, 529 U.S. 1028 (2000). The Sixth Circuit issued its order in April 2000, which was received and docketed by the district court. That same month, Sanders completed his supervised release period under the original sentence.

The district court took no action following the Sixth Circuit's order. After waiting for a Supreme Court decision on a related topic,[1] the government made its first request that the case be advanced for resentencing in June 2001. Sanders' attorney successfully moved to be reappointed to the case in July 2001 and filed a response to the government's resentencing motion in October 2001. The response argued that resentencing would violate Sanders' Sixth and Eighth Amendment rights and requested a stay so that Sanders could be located. In November 2001, the government replied to the constitutional claims and requested a warrant for Sanders' arrest to "avoid a charge

---

[1]*Daniels v. United States*, 532 U.S. 374 (Apr. 25, 2001) (holding that absent a violation of *Gideon v. Wainwright*, a defendant may not use § 2255 to challenge the constitutionality of predicate convictions).

[that] the government failed to exercise due diligence in locating the defendant, and to facilitate his resentencing." The district court did not issue the stay, took no action on the briefs, and did not issue an arrest warrant.

The government alleges that in July 2002, the Chief of the Criminal Division of the U.S. Attorney's Office for the Northern District of Ohio wrote a letter to the district court, expressing concern over the delay and renewing the government's request for an arrest warrant. The district court, though, has no recollection of having received this letter, and it does not appear on the court's docket sheet. The district court took no action during this period.

One year later, in June 2003, the government again moved for the district court to advance the case. This motion also appears not to have been docketed by the district court, but Sanders concedes that this motion was filed. The district court responded six months later, issuing a warrant for Sanders' arrest in December 2003. Sanders was located within eight days of the issuance of the warrant and arrested without incident. He then was released on bond without objection.

In January 2004, the court granted Sanders' request to file a supplemental brief in opposition to the motion for resentencing. The brief was filed in February 2004 and the government responded in March 2004. Again, the district court took no action. Finally, the government filed a petition for a writ of mandamus with this court in October 2004. In November 2004, the district court issued a ruling, denying Sanders' constitutional claims and reimposing the 180-month sentence required by the ACCA.[2] On the same day, the district court submitted a response to the petition for a writ of mandamus, taking responsibility for the delay in resentencing and stating that its action in imposing the sentence rendered the mandamus action moot. Sanders then filed this timely appeal, arguing that resentencing after such a lengthy delay violated his constitutional right to due process.

## II.

A due process claim raising a mixed question of law and fact is reviewed *de novo*. *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001). Sanders claims that the delay of over four years, from the issuance of a mandate by this court in April 2000 to his resentencing in November 2004, violated his constitutional right to due process.[3]

## A.

We must first address the proper framework for analyzing Sanders' claim. Sanders' primary argument is that the delay violated his right to substantive due process. Relying on language in *United States v. Lundien*, 769 F.2d 981 (4th Cir. 1985), *Hawkins v. Freeman*, 195 F.3d 732 (4th Cir. 1999) (en banc), and *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), he argues that it violates due process for a court to correct a sentence, even an illegal one, after so much time has passed that a defendant's expectations as to its finality have "crystallized." We believe that Sanders has misconstrued his claim. Unlike the cases cited by Sanders, the situation before us does not involve an increase in the severity of a sentence following an administrative or other governmental error. In *Lundien*, the court stated its intent to sentence the defendant to a twenty-year prison term. When

---

[2] As Sanders was sentenced to a statutory mandatory minimum, rather than pursuant to the sentencing guidelines, we have no occasion to consider whether his sentence is affected by *United States v. Booker*, 543 U.S. 220 (2005). *See United States v. Duncan*, 413 F.3d 680, 683 (7th Cir. 2005); *United States v. Bermudez*, 407 F.3d 536, 545 (1st Cir. 2005).

[3] Sanders' brief refers to the Fourteenth Amendment, but as the government notes in its brief, it is the Fifth Amendment which applies to the federal government. As the government concedes that there is no difference between the amendments for the purposes of the due process analysis in this case, we analyze Sanders' claims under the Fifth Amendment.

the court handed down the sentence, however, the total term of imprisonment was only ten years. Five days later, upon motion of the government, the court corrected its error. *Lundien*, 769 F.2d at 983. The defendant in *Hawkins* was mistakenly granted parole. Twenty months later, the state noticed the error, revoked the parole and rearrested the defendant. *Hawkins*, 195 F.3d at 736-37. In both cases, the Fourth Circuit used a substantive due process framework to evaluate the claims. As neither defendant had reason to believe an error had occurred, the court analyzed whether their expectations as to the finality of their sentences had "crystallized" so that it would be fundamentally unfair to defeat those expectations. In both cases, the court held that resentencing would not be unfair and that the changes in sentence did not violate the defendant's constitutional rights. *Lundien*, 769 F.2d at 987; *Hawkins*, 195 F.3d at 750. *See also DeWitt v. Ventetoulo*, 6 F.3d 32 (1st Cir. 1993) (finding a due process violation when, after a delay of six years, the state attempted to reimpose a life sentence that had been suspended in violation of state law).

The relevant actions in the cited cases did not occur in the context presented here. In all three cases, the defendants had been sentenced, had begun to serve the sentence, and had no knowledge that a mistake had been made. In contrast, Sanders has persistently argued for over ten years that he should receive a lower sentence. His release was not due to a clerical error or other negligent act of which Sanders was not aware; the district court ordered him released based on a conclusion of law later deemed to be in error. However, Sanders knew that the district court's ruling on the § 2255 motion was being appealed and was not yet final. Thus, he had no "expectation of finality" as to his sentence.[4] Indeed, Sanders does not claim that the completion of his sentence, his release from jail, or the completion of his supervised release triggered a due process violation. Rather, he contends that the district court's delay in resentencing after remand of his § 2255 motion violated his right to due process and that the completion of the 37-month sentence first imposed by the district court after conviction is a factor in the analysis. This question is one of procedure.

## B.

A defendant maintains a right to due process in a criminal proceeding until the entry of final judgment. This right guarantees not only that the required process will be afforded, but that it will be afforded without "oppressive delay." *United States v. Lovasco*, 431 U.S. 783, 789 (1977); *see also United States v. Smith*, 94 F.3d 204, 206-07 (6th Cir. 1996).

At first glance, this right seems related to the Sixth Amendment's speedy trial guarantee. U.S. Const. amend. VI. While Sanders does not make a Sixth Amendment claim, he argues that his due process claim can be adjudicated using the same framework established for analyzing speedy trial violations. *See Barker v. Wingo*, 407 U.S. 514 (1972). The *Barker* test balances four factors – the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant – to determine if the right to a speedy trial has been violated. *Id.* at 530. The Supreme Court has applied this framework in cases analyzing delays between a forfeiture action and trial, *United States v. $8,850 in U.S. Currency*, 461 U.S. 555, 564-65 (1983), and delays between indictment and arrest, *Doggett v. United States*, 505 U.S. 647, 651-58 (1992). Although the Court has never directly ruled on the test's applicability to delays between trial and sentencing,

---

[4]Although substantive due process is not the proper framework for consideration of Sanders' claim, it would fail under a substantive due process analysis. To succeed, Sanders would have to show that the government's conduct in this case "shocks the conscience" and that the conduct deprived Sanders of a liberty interest cognizable under the Constitution. *Lewis*, 523 U.S. at 846-47. Sanders' claim cannot satisfy either requirement. The government's conduct in this case does not rise above that of mere negligence. Sanders cannot show the bad faith or deliberate misuse of power necessary to satisfy the *Lewis* test. *See Hawkins*, 195 F.3d at 746 (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126 (1992)). Moreover, the asserted liberty interest – "the right to resist reincarceration and to protect settled expectations of freedom" – is not one protected by the Constitution when the defendant has been convicted, had that conviction affirmed, and the court seeks to impose a lawful sentence. *Cf. Hawkins*, 195 F.3d at 750 (rejecting a similar argument).

*see Pollard v. United States*, 352 U.S. 354, 361 (1957) (assuming *arguendo* that the test could be applied to such a delay), the majority of circuits, including this one, use it for these claims. *See, e.g.*, *United States v. Reese*, 568 F.2d 1246, 1253 (6th Cir. 1977); *Burkett v. Cunnigham*, 826 F.2d 1208, 1220 (3d Cir. 1987) (collecting cases); *United States v. Campbell*, 531 F.2d 1333, 1335 (5th Cir. 1976). No court has previously addressed the question of whether *Barker* is the appropriate framework for analyzing a delay after a conviction and sentence have been affirmed on direct appeal. We hold that it is not.

The Court's stated aim in *Barker* was to develop a test for a right that "is generically different from any of the other rights enshrined in the Constitution for the protection of the accused." 407 U.S. at 519. The Court noted the many interests society has in the speedy adjudication of criminal matters, as well as the unique characteristics of the right – such as its vagueness and the possibility of its harming, as well as helping, defendants. *Id.* at 520-21. The Court developed the test in light of these characteristics and to protect the purposes underlying the right: (1) to prevent undue and oppressive incarceration prior to trial, (2) to minimize anxiety and concern accompanying public accusation and (3) to limit the possibilities that long delay will impair the ability of the accused to defend himself. *Id.* at 532.

The Supreme Court has also applied this framework to claims brought under the Due Process Clause, but only when the same fundamental interests are implicated. In *United States v. $8,850 in U.S. Currency*, the defendant had over eight thousand dollars confiscated by border officials for failing to make an adequate declaration. The government then waited 18 months before filing a civil forfeiture action. 461 U.S. at 558-59. The Court used the *Barker* framework in analyzing whether this delay violated due process. *Id.* at 564. The Court recognized that the Sixth Amendment did not apply, as the defendant had not been indicted, arrested, or otherwise deprived of her liberty. However, the defendant had been "entirely deprived of the use of [her] property," and thus, like in the Sixth Amendment context, a prompt adjudication of the case was necessary to minimize the burden imposed on an individual whose rights had not yet been determined. *Id.*; *see also Doggett*, 505 U.S. at 670 (Thomas, J., dissenting) ("[A]pplication of *Barker* presupposes that an accused has been subjected to the evils against which the Speedy Trial Clause is directed . . . .").

This court followed a similar approach in applying a modified *Barker* test to determine whether a delay during a direct criminal appeal violated the defendant's right to due process. *Smith*, 94 F.3d at 207-08. The court in *Smith* recognized that the Due Process Clause places some limit on the appellate process, even if the right to appeal is not guaranteed. The court noted that a speedy appeal was necessary for similar reasons underlying the right to a speedy trial: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Id.* at 211 (citing *Harris v. Champion*, 15 F.3d 1538, 1559 (10th Cir. 1994)). Due to these similarities, the court found the *Barker* test appropriate for analyzing the constitutional question. *Id.* at 207; *accord Harris*, 15 F.3d at 1558; *Simmons v. Reynolds*, 898 F.2d 865, 868 (2d Cir. 1990).

The Supreme Court has not used the *Barker* framework, however, when the case implicates neither the Sixth Amendment nor the interests protected by the test. In *United States v. Marion*, 404 U.S. 307 (1971), the Court held that the Speedy Trial Clause does not apply until an individual is arrested or indicted, regardless of whether the person is under investigation. The Court reasoned that the inquiry is not the passage of time but whether the purposes behind the speedy trial guarantee are implicated.

> Passage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability

> to defend himself. But this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context.

*Marion*, 404 U.S. at 321-22 (footnote omitted). Protection against oppressive delay, the Court held, is provided by the Due Process Clause. *Id.* at 324-25. Reaffirming this holding in *United States v. Lovasco*, the Court developed a new test, rather than using the *Barker* factors, to determine when a delay outside the speedy trial context violates a defendant's right to due process. 431 U.S. at 790 (citing *Marion*, 404 U.S. at 324-25). The court looked to the government's proffered reasons for the delay and the prejudice suffered by the defendant in determining whether a delay in bringing a pretrial indictment violated due process. *Id.* at 795-96.

In *United States v. MacDonald*, 456 U.S. 1 (1982), the Court again implicitly limited *Barker*'s reach. The defendant in that case was accused of committing a murder on a military base. The military brought charges, which were eventually dropped, and the defendant was honorably discharged. Four years later, the government obtained an indictment in federal district court charging the defendant with the crime. He claimed that the delay violated his Sixth Amendment right to a speedy trial. The Fourth Circuit agreed, applying the *Barker* factors. 632 F.2d 258, 266-67 (4th Cir. 1980). The Supreme Court reversed. 456 U.S. at 11. The Court stated that the protections afforded by the speedy trial guarantee did not apply to the time period after the dismissal of the military charges and before the civil indictment. During that time, the Court reasoned, there was no pretrial incarceration, no impairment of liberty associated with being released on bail, and no "disruption of life caused by arrest and the presence of unresolved criminal charges." *Id.* at 8. While the defendant perhaps suffered stress or anxiety, it was no greater than any other person under criminal investigation. *Id.* at 9. Thus, the Due Process Clause, rather than the Sixth Amendment, provided the appropriate framework for analyzing the delay. "The Sixth Amendment right to a speedy trial is . . . not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause . . . ." *Id.* at 8. Thus, "[a]ny undue delay" before and after the period protected by the Sixth Amendment "must be scrutinized under the Due Process Clause . . . ." *Id.* at 7. On remand, the Fourth Circuit applied the *Lovasco* framework to the defendant's claim. 688 F.2d 224, 226-27 (4th Cir. 1982), *cert. denied*, 459 U.S. 1103 (1983).

Just as the right to a speedy trial does not attach until a criminal proceeding has been initiated and a defendant faces a real and immediate threat of conviction, so too does it cease to apply when the conviction becomes definitive. This occurs when the conviction is affirmed on direct appeal, if not sooner. The situation faced by Sanders falls outside the Sixth Amendment's protections and thus, "[a]ny undue delay . . . must be scrutinized under the Due Process Clause." *MacDonald*, 456 U.S. at 7. Moreover, a delay in resentencing following an unsuccessful collateral attack does not implicate any of the interests protected by the *Barker* test. Sanders has been afforded both a trial and an appeal to challenge the deprivation of his liberty and his sentence. Although the collateral attack may change the sentence, the outcome of the case will not change, reducing the threat of undue or oppressive incarceration. The finality of the original proceeding also eliminates the concern that the defendant will suffer any anxiety from public accusation or the pendency of the direct appeal. Any remaining anxiety is simply that of an individual who faces punishment following the exhaustion of all possible appeals. Finally, when all that remains of a case is the imposition of a sentence, the danger of losing witnesses or other evidence needed to mount an adequate defense is minimized, if not eliminated completely. The Supreme Court has never

extended *Barker* beyond the protection of these interests, and we decline to do so today. The *Barker* test is not applicable to the case at hand.[5]

C.

A delay in resentencing, however, can still run afoul of due process guarantees. Just as the government cannot unduly prolong an investigation before bringing an indictment, *Lovasco*, 431 U.S. at 790, due process also imposes an outer limit on the government's window of opportunity to resentence a defendant following an appeal. Though the *Lovasco* line of cases addresses pretrial delays, we find it equally applicable to the present case. As in the time period before the Sixth Amendment right to a speedy trial attaches, the primary concern after the right ceases to apply is "oppressive delay." The *Lovasco* framework is well-suited to analyze whether such a delay has occurred. Thus, we hold that after a conviction has been affirmed on appeal, and a case is remanded solely for resentencing, the question of whether any delay in imposing the sentence violates the defendant's right to due process can be answered by looking to: (1) the reasons for the delay; and (2) what prejudice the defendant has suffered as a result of the delay. Like the Court in *Lovasco*, we emphasize the limited role of the judiciary in this inquiry. "Judges are not free, in defining 'due process,' to impose on law enforcement officials our 'personal and private notions' of fairness . . . ." *Id.* at 790 (quoting *Rochin v. California*, 342 U.S. 165, 170 (1952)). "[Courts] are to determine only whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency.'" *Id.* (internal citations omitted).

Sanders bears a heavy burden in showing that he has been the victim of a fundamentally unfair process. A defendant in his situation has already been afforded due process in the form of a fair and speedy trial, a timely conviction and sentence, and appellate review. Thus, while the protections of the Due Process Clause still apply, a strong showing is required to invoke the remedy that results from finding a due process violation – suspension of the remainder of the sentence. Our analysis of the two *Lovasco* factors leads us to conclude that Sanders has not met this burden.[6]

We look first to the reasons for the delay. This court has emphasized that the government's motive for the delay plays an important role in determining whether a due process violation has occurred. *See, e.g.*, *United States v. Greene*, 737 F.2d 572, 575 (6th Cir. 1984) (finding no due process violation because the government did not delay to gain a "tactical advantage"). A showing that the government made little or no effort to seek a timely resentencing by the district court may create a presumption of a due process violation. *Cf. Dewitt*, 6 F.3d at 35-36 (finding a due process violation based in large part on the government's taking no action to correct a sentencing error). Moreover, any evidence that the delay was purposeful or due to bad faith would provide strong

---

[5] We note that this holding is not in conflict with this court's decision in *United States v. Thomas*, 167 F.3d 299 (6th Cir. 1999). In *Thomas*, our court used the *Barker* framework to analyze whether a delay in resentencing following a direct appeal violated the Constitution. The opinion, however, applied *Barker* without explicitly holding that it is the appropriate framework. Moreover, the analysis in *Thomas* focused on a potential violation under the Sixth Amendment, not the Fifth Amendment's Due Process Clause. *Id.* at 303.

[6] This court has interpreted *Lovasco* to hold that both conditions are necessary to find a due process violation. *See United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992) (citing *United States v. Brown*, 667 F.2d 566, 568 (6th Cir. 1982) (per curiam)). *See also United States v. Gouveia*, 467 U.S. 180, 192 (1984) (suggesting in dicta that both parts must be met). As all of these decisions concern pretrial delay, they are not binding in this case. We need not decide today whether either prong of this test is a necessary or sufficient condition for finding a due process violation in a post-trial delay. A scenario can be imagined where the defendant suffers harsh prejudice, but the government puts forth an excellent rationale excusing the delay. Likewise, it is possible that a lengthy delay that is shown to be the product of bad faith or unfair dealing on the part of the government does not require a showing of prejudice. In the case at hand, however, Sanders' claim cannot satisfy either part of the due process analysis.

evidence of a due process violation. Bad faith requires an affirmative showing by the defendant; it cannot be implied from circumstantial evidence. *See United States v. Brown*, 959 F.2d 63, 66-67 (6th Cir. 1992). On the other hand, a showing by the government that the delay was intended to benefit the defendant counsels against a due process violation.

In this case, Sanders has put forth no evidence of malice or bad faith on the part of the government. Rather, the record indicates that the government made a good-faith effort to sentence Sanders in a timely fashion. After waiting for the outcome of a related Supreme Court case – which only could have benefitted Sanders – the government made three separate requests to the district court for resentencing. The attorneys working the case likely could have made more frequent requests for a timely disposition, but their stated rationale for not doing so – to maintain a good rapport with a judge before whom they appear frequently – is justifiable.[7]

Finally, we look to what role Sanders played in creating or augmenting the delay. The defendant does not have a duty to petition the court for resentencing; the onus falls on the government. However, if the defendant exercises his right to make motions or other filings with the court that delay the court from issuing its final ruling, the defendant cannot then argue that this period of time creates a due process violation. Moreover, any finding that the defendant deliberately caused the delay – i.e., by failing to cooperate with the government investigation, *see Margroff v. Anderson*, No. 96-3817, 1999 WL 71576, at *4-5 (6th Cir. Jan. 14, 1999), or by making numerous frivolous filings – counsels against finding a due process violation. This does not in any way limit the right of Sanders or any other defendant from mounting a vigorous defense. Our duty simply is to take into account the amount of the delay resulting from the defendant's own actions and weigh this against the delay caused by the government or the court.

In this case, the government does not allege that Sanders acted deliberately to delay the government's case or that he made excessive or frivolous filings. Sanders did file two motions opposing resentencing, both of which required responses and rulings by the court, but this action did not greatly contribute to the four-year delay. Nevertheless, when viewed in conjunction with the government's rational explanations for its actions, it cannot be said that the reasons for the delay violated Sanders' constitutional right to due process.

Sanders has also failed to make any showing of prejudice that would give rise to a due process violation. As noted above, he already has been convicted in a fair and speedy trial, been sentenced in a timely fashion, and had his conviction and sentence upheld on appeal. Sanders also has had an opportunity to challenge his sentence further via collateral attack. The delay will in no way affect his ability to raise a defense or present evidence, because the only procedure presently at issue is imposition of the minimum sentence under the ACCA. Moreover, Sanders arguably derived some benefit from his early release from prison. He was able to reunite with his children and provide a strong role model for them; he was able to meet and marry his current wife and form a relationship with her children; and he was able to play a more active role in his community. Throughout the entire process, Sanders was on notice that his sentence had been challenged and that he could potentially be returned to prison. Reimprisonment unquestionably will impose a burden on Sanders, but this is attributable to the underlying offense for which he was convicted, not the delay in resentencing. Thus, he has not met his burden of showing prejudice suffered as a result of the delay.

---

[7]Sanders argues that the purposeful delay by the district court constitutes a due process violation. While it is possible that egregious delay by a court could rise to the level of a due process violation, it does not do so in this case. The court conceded that the purpose of its delay was to benefit Sanders, as the court did not wish to impose the lengthier sentence. There is no evidence of bad faith or an intent to act to Sanders' detriment, which would be necessary to find that a court violated a defendant's right to due process under these circumstances. We in no way condone, however, the district court's decision to delay resentencing in this case.

Sanders has failed to show either that the delay was the result of bad faith or an attempt to gain a tactical advantage on the part of the government, or that he suffered any prejudice as a result of the delay. Although four years is a long period of time between remand and sentencing, we cannot say that the delay in this case "violate[d] fundamental conceptions of justice" or offended "the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790. We find no due process violation.

III.

The dissent argues that we should follow the test set forth by the First Circuit in *DeWitt v. Ventetoulo*, 6 F.3d at 35, and later used by a panel of this court in *United States v. Mayes*, No. 97-6430, 1998 WL 552673 (6th Cir. Aug. 19, 1998) (unpublished). Neither of these cases is binding upon us, and we decline to follow them because we are not persuaded by the *DeWitt* framework. To begin with, the court in *DeWitt* does not seem to be establishing a legal rule so much as fashioning a remedy for the "very unusual" situation faced when the state seeks to reimprison a defendant who had no knowledge whatsoever that his release from prison was in error and that he could be returned to jail. *DeWitt*, 6 F.3d at 36. The court relies on a number of factors but explicitly states that no multi-part formula exists for deciding such an issue. *Id.* at 35. Moreover, the *DeWitt* "test" applied by *Mayes* and the dissent is itself problematic. The test does not focus on whether the delay violated a substantive right of the defendant or whether it resulted in the defendant being denied an adequate procedure to protect his rights. Rather, it seems to conflate the procedural due process factors delineated in *Barker* with the substantive due process right discussed in *Hawkins* and *Lundien* to create a sort of hybrid right not to be returned to prison. As we have determined that neither *Hawkins-Lundien* nor *Barker* provides a proper framework for this case, we find *DeWitt*'s attempt to combine the two unpersuasive. For the reasons discussed above, Sanders' claim is properly analyzed under the two-step *Lovasco* test.

Apart from its legal analysis, the dissent devotes much attention to its perception of the equities of this case. Despite the dissent's extensive narration about Sanders' post-release conduct, there is no evidence in the record about Sanders' present situation. The dissent and the district court accepted Sanders' assertions about his current life without question or an evidentiary hearing. We have no way of knowing if these assertions are true or if there are other facts not presented to the court which would call these claims into question. Whatever his present lifestyle, we do know that Sanders has a serious criminal past, resulting in his designation as an armed career criminal. Thus, however disconnected this offense may have been from other violent conduct, this defendant is one whom the legislature and the government have selected for significant punishment. Our role is not to second-guess their decision.

IV.

For the foregoing reasons, we affirm the sentence imposed by the district court.

---------------------

**DISSENT**

---------------------

BOYCE F. MARTIN, JR., Circuit Judge, dissenting. In the district court's own words, "[t]he history of this case is indelibly etched in the court's memory." This case too will forever be etched in my mind as one of the most fundamentally unfair results that I have ever witnessed in thirty-plus years as a judge.

**I.**

Lummie Sanders was arrested and charged with being a felon in possession of a firearm. The presentence report states that

> on November 24, 1992, the defendant personally pawned the shotgun described in the indictment at Silver Hardware and Loan. Since he had prior felony convictions, his actions constituted an illegal possession of the firearm. On November 30th, he regained physical possession of the shotgun by paying off the loan; but, in the process of recovering the shotgun, he falsely indicated on ATF Form 4473 that he had no previous felony record. Then, on December 10, 1992, the defendant once again pawned the same shotgun at the same store, constituting a second occasion of illegal possession of the firearm.[1]

Sanders was arrested and entered a plea of not guilty. Following the plea of not guilty, the government filed a notice of its intent to seek an enhanced sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e), which provides for a fifteen year mandatory minimum sentence.

The jury found Sanders guilty, and at sentencing, Sanders challenged the validity of his prior convictions. The district court found a prior assault conviction to be constitutionally invalid and refused to impose the mandatory minimum fifteen year sentence. Instead, the district court sentenced Sanders to thirty-seven months imprisonment. The district court took note of the defendant's family situation as described in the presentence report. The report stated that the defendant had nine children, three of whom were adults and had moved out of the home, but six of whom the defendant was currently raising. The report stated that Sanders did not "know who will care for his children if he is incarcerated. He said that their mother is in no condition to care for them." The district court found that Sanders was living with and providing for his minor children, which was "totally out of the mainstream." On appeal, this Court reversed and held that the prior assault conviction should have been counted by the district court. *United States v. Sanders*, 1994 WL 714377 (6th Cir. 1994) (unpublished). We remanded, however, for consideration as to whether Sanders's prior conviction for involuntary manslaughter ought to be considered an ACCA predicate conviction.

On remand, the district court determined that Sanders's prior conviction for involuntary manslaughter was a violent felony for purposes of the enhanced sentence and therefore sentenced Sanders to 188 months imprisonment. On appeal, this Court again reversed, holding that the district court erred by not considering a downward departure to the minimum sentence of 180 months. *United States v. Sanders*, 97 F.3d 856 (6th Cir. 1996). The district court then reduced Sanders's sentence to 180 months imprisonment.

---

[1]In its response to the mandamus action, the district court noted that "[t]he weapon was not used in a separate crime as is often the case. In other words, as is frequently the case with prosecutions of a felon in possession, no crime of violence was associated with the criminal conduct."

On August 1, 1997, Sanders filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255, once again attacking his prior assault conviction. On April 10, 1998, the district court agreed with Sanders and vacated the fifteen year sentence. *Sanders v. United States*, 8 F. Supp. 2d 674 (N.D. Ohio 1998). The court then resentenced Sanders to the original term of imprisonment of thirty-seven months and ordered him released from custody on April 24, 1998.

This is where things got interesting. Although he was released from prison, Sanders began a two-year reporting requirement with the Probation Department for the Northern District of Ohio. During this time, the department made regular home and job visits to monitor Sanders's progress. Also during this time, Sanders had regular drugs tests — sixteen of them — all of which were negative. Two years later this Court reversed the district court's grant of habeas relief. *Sanders v. United States*, 1999 WL 591455 (6th Cir. 1999) (unpublished). The Supreme Court denied certiorari on March 20, 2000.

On April 23, 2000, however, the Probation Department sent Sanders a "Notice of Discharge" letter which informed him that "inasmuch as you completed service of your sentence . . . you are hereby discharged from supervision of this office on the above sentence." The department obviously had knowledge of Sanders's home address and place of employment.

For the next *fourteen months* the government did *nothing* to advance resentencing. It was not until June 21, 2001, that the government sought to advance the case for resentencing pursuant to this Court's mandate. Counsel was appointed for Sanders on October 2. On October 29, counsel argued that it would be unconstitutional to resentence Sanders and also informed the court that he had been unable to locate his client. Thus, Sanders had not been informed of this Court's reversal or of the government's fourteen-month delay in advancing the case. A month later, the government replied and "respectfully requested" that a warrant be issued to locate Sanders. No further action was taken by anyone for about the next *nineteen months* or approximately five hundred and fifty days. Then, on June 6, 2003, the government renewed its request that the district court issue a warrant for Sanders's arrest. By this point, Sanders had been out of prison for *five years and two months* with the belief that he was a free man and with no remaining debt to society and no information to the contrary.

After June 6, nothing happened again for more than *six months*. It was not until December 12, 2003 that the district court issued a warrant and Sanders was taken into custody on December 22. On the 23rd, Sanders was released on bond after it was clarified that he had been living openly at a fixed residence in the Cleveland area, had no violations of probation or the law, had been discharged by the probation department, and informed that he had completed service of his sentence.

On February 10, 2004, Sanders filed a response to the government's motion for sentencing and requested an evidentiary hearing and oral argument. The government filed a response on March 9. The district court did not take any action. On *October* 22, 2004, nearly a year since Sanders's re-arrest, the government filed a mandamus action in this Court seeking to compel the district court to return Sanders to prison, six years after his release, to complete the remainder of the sentence. Approximately *eleven* years remained on the sentence. One month later, the district court entered an order rejecting Sanders's arguments and directing Sanders to self-surrender for the purpose of completing the balance of the sentence.

The district court also filed, on the same date, its *Answer of David D. Dowd, Jr.*, in the pending mandamus action. In his response, Judge Dowd recounted the history of the case, which he stated "is indelibly etched in the court's memory." Judge Dowd conceded his reluctance to "address the issue because of my strong belief that the sending of the defendant back to prison under all the circumstances of this case is unwarranted." Judge Dowd further commented that his belief

that the prior conviction should not count, "coupled with the defendant's commitment to his five children back in 1993, gives rise to my disagreement with the exercise of the prosecutorial discretion to seek a sentence of 180 months where the weapon was not used in the commission of a separate crime." Judge Dowd stated that he is a strong believer in prosecutorial discretion, but suggested that the decision to seek an enhanced sentence in this case was made only

> after the defendant was arraigned and entered a plea of not guilty. The provisions of the statute give the prosecutor enormous bargaining power. The power seems to be exercised with respect to defendants who do not immediately enter pleas of guilty . . . So my concern about the exercise of prosecutorial discretion in this case rests primarily upon the obvious, enormous disparity in the sentencing consequences of Sanders'[s] decision to contest the charges.

Judge Dowd stated that he accepted "[t]he stark reality . . . that I am required to order Sanders to return to prison. . . . I have concluded that I am left with no alternative, short of retirement or recusal, other than to direct Lummie Sanders to return to prison." (Judge Dowd, a respected jurist, further stated that "[a]lthough I have seriously considered the alternatives of both retirement and recusal as a way of escaping the incredibly distasteful task of telling the defendant that he must return to prison, these alternatives would simply transfer the onerous task to another judge of this court. The court has too much respect and admiration for the difficult tasks the other judges of this court face to shift the responsibility to another judge.") Judge Dowd then explained his "strong support" for a presidential pardon for Lummie Sanders and opined that Sanders's case is an exceptional one justifying such relief. To further that process, Judge Dowd decided to "forward a copy of this Answer, with its Appendices, to the Office of the President of the United States and also Senators Mike DeWine and George Voinovich, and to Congresswoman Stephanie Tubbs Jones for their information and for whatever course of action, if any, they may wish to take separately or collectively in this case."

## II.

Now on appeal, Sanders argues that reimposing the sentence more than six years (or nearly 2,200 days) of freedom and operating under the belief — as he was told as much by the government — that he was a free man, would violate his rights under the Due Process Clause. There is case law *strongly* supporting his position.

*DeWitt v. Ventetoulo*, 6 F.3d 32 (1st Cir. 1993) is the leading case in this area of due process questions. The question in the case was whether the state of Rhode Island had acted "unconstitutionally in increasing DeWitt's sentence and reimprisoning him after his release on parole." *Id.* at 32. DeWitt had been sentenced to life imprisonment in 1978. In 1981, however, "DeWitt came to the aid of a prison guard who was being assaulted by an inmate." *Id.* at 33. The state court then suspended all but fifteen years of DeWitt's life sentence and DeWitt served six more years before his parole application was granted. *Id.* Prior to DeWitt's release, however, in 1983, the Rhode Island Supreme Court held, in a different case, that a superior court could not "suspend" a sentence once the defendant began serving it. *See id.* Between this time and 1987 when DeWitt was paroled, the state made no effort to have the superior court correct its error in DeWitt's case. *Id.* Despite the 1983 ruling, DeWitt was paroled in 1987 "as if the order suspending his sentence in part was still in force." *Id.*

"During the eight months following his release in January 1987, DeWitt obtained work, beginning a painting business and then a siding business. He resumed his relationship with family members and his girlfriend." *Id.* In September, however, DeWitt was involved in an altercation which led to criminal charges, the result of which was the superior court's decision to vacate its 1981 ruling, leaving DeWitt's life sentence in place. *Id.* DeWitt was reincarcerated and sought

relief in federal court. The district court, relying on *Breest v. Helgemoe*, 579 F.2d 95 (1978), granted DeWitt relief finding that the state's decision to reimpose the life sentence violated DeWitt's due process rights.

The First Circuit affirmed following a lengthy analysis. First, the court noted that "[t]he Constitution contains no general rule that prohibits a court from increasing an earlier sentence where the court finds that it was erroneous and that a higher sentence was required by law." *Id.* at 34. "But," according to the court, "in law what is true for the usual case is often not true in the extreme case." *Id.* (noting that "[e]ven the state conceded at oral argument that due process must impose some outer limit on the power to revise sentences upward after the fact"). Citing *Breest*, the court noted that "[a] convicted defendant does not automatically acquire a vested interest in a mistakenly low sentence. Only in the extreme case can a court properly say that the later upward revision of a sentence, made to correct an earlier mistake, is so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause." *Id.* at 35.

Recognizing that "there is no single touchstone for making this judgment, nor any multi-part formula," the court determined that

> attention must be given . . . to the lapse of time between the mistake and the attempted increase in sentence, to whether or not the defendant contributed to the mistake and the reasonableness of his intervening expectations, to the prejudice worked by a later change, and to the diligence exercised by the state in seeking the change.

*Id.* Here, the court found that the state was not diligent in seeking to correct the error of the suspended sentence. *Id.* Moreover, the court found that "circumstances changed substantially." *Id.* Specifically, the court found that DeWitt spent six years in prison with the belief that he was near parole *and* more importantly, found that DeWitt was *actually* released from prison. *Id.* Additionally, the court found that DeWitt had spent eight months released in society, had "laid down new roots," acquired a job and reestablished family ties. *Id.* The court found that this "lengthy delay and change of circumstances are not decisive but they contribute to the judgment." *Id.*

The court then held that "due process must in principle impose an outer limit on the ability to correct a sentence after the event." *Id.* at 36. Realizing, as I do here, that the problem is one of "deciding how much is too much," the court concluded that DeWitt's circumstances crossed the line into the unconstitutional by focusing on "a range of considerations." *Id.* The court focused on

> the multi-year period between the suspension and the reimposition of sentence, the reasonableness of DeWitt's reliance, his release from prison and formation of new roots, the unusual tardiness of the state in failing to correct the error from 1983 onward, and the existence of an alternative parole revocation remedy. These elements cannot be calibrated precisely, nor can they be taken in isolation. The outcome here is the result of the combined weight of the elements.

*Id.* In conclusion, the court stated:

> We reach our conclusion here with diffidence because federal judges have no monopoly on wisdom in decision what is unfair, and even harsh decisions by state authorities usually raise no constitutional issue. But we are confident that this case is very unusual and that our decision imposes no serious constraint on state authorities who, unlike federal judges, have the direct responsibility for law-enforcement and prosecutorial tasks at hand. In sum, this case is the very rare exception to the general rule that courts can, after sentence, revise sentences upward to correct errors.

*Id.*

Likewise, the Fourth Circuit has held that "due process may also be denied when a sentence is enhanced after the defendant has served so much of his sentence that his expectations as to its finality have crystallized and it would be fundamentally unfair to defeat them." *United States v. Lundien*, 769 F.2d 981, 987 (4th Cir. 1985). The Third Circuit has also recognized this principle. *United States v. Davis*, 112 F.3d 118, 123 (3d Cir. 1997) (quoting *Lundien* and stating that a due process violation will be found "in an extreme case that a later upward revision of a sentence is so unfair that it is inconsistent with the fundamental notions of fairness"). So has the Eleventh Circuit. *United States v. Davis*, 329 F.3d 1250, 1255 (11th Cir. 2003) ("A defendant's due process rights may be violated when a sentence is enhanced after the defendant has served so much of his sentence that his expectations as to finality have crystallized and it would be fundamentally unfair to defeat them."). The majority fails to distinguish *DeWitt*, which I believe should dictate a finding in favor of Sanders in this case.

Even more unfortunate is the fact that the majority does not cite or consider this Court's prior unpublished decision wherein we adopted *DeWitt* as the standard for reviewing this type of claim. The unpublished disposition from this Court, if followed, would also lead to a finding in favor of Sanders. In *United States v. Mayes*, 162 F.3d 1162 (6th Cir. 1998) (unpublished), a unanimous panel held that it was a due process violation to reimpose a sentence five years after it was erroneously recorded as suspended. Mayes had pleaded guilty to criminal charges leading to a sentencing guideline range of 33-41 months. *Id.* at *1. Mayes, however, provided substantial assistance to the authorities and the government moved for a downward departure and agreed on a recommended sentence of six months in a halfway house followed by two years of supervised release. *Id.* When the judgment was filed in 1992, it erroneously stated "IMPOSITION OF SENTENCE SUSPENDED" and also stated that Mayes was to self-surrender "as notified by the Clerk's Office." *Id.* The Clerk's office never notified Mayes and he never went to the halfway house. As this Court noted, "it was well established at the time of Mayes's sentence that a district court had no authority to suspend a sentence, as the term is commonly understood." *Id.* (citation omitted).

> At any rate, Mayes sat pretty, undisturbed by the law. After two years, Mayes moved to Florida where he began working in the secondary-mortgage business. Mayes then returned to Memphis and began his own secondary-mortgage business. He has been extremely successful and his company now employs scores of people. While Mayes's partner runs the business day to day, Mayes is in charge of sales and marketing, a job that entails extensive travel to trade shows. Mayes claims that he is presently the only person in the company qualified to perform this function.

*Id.* at *2. In 1997 the sentencing judge retired and the case was assigned to another judge, who, in reviewing the records, noticed the error in the judgment. *Id.* The district court then issued a *sua sponte* order removing the suspension language resulting in the reiteration of the sentence of six months in the halfway house. *Id.*

On appeal, Mayes claimed that the reimposition of the sentence violated his due process rights and this Court agreed. We stated: "This leaves the core due-process question: Was it too late for the district court to reiterate Mayes's sentence, such that doing so was fundamentally unfair?" *Id.* at *4. After citing and discussing *DeWitt*, this Court stated that "[a]lthough we do not purport to establish a rigid multi-factor test, since this is a fact-bound inquiry that requires a nuanced and case-specific analysis," the *DeWitt* "factors are useful for analyzing Mayes's case." *Id.* In its analysis the Court stated: "First, the five-year span between iteration and reiteration of Mayes's sentence is problematic. Second, Mayes did not contribute at all to the original error here." *Id.* We

found that Mayes's "expectations were not wholly reasonable, [but] they were still reasonable enough." *Id.* "Third," the Court found, "the prejudice faced by Mayes is harsh, though not as harsh as if he were being sent to prison (or, *a fortiori*, being sent *back* to prison like DeWitt)." *Id.* at *5 (emphasis in original).[2] Finally, the Court found that "the government . . . has displayed a total lack of diligence in pursuing this matter." *Id.* In sum, "[a]ll of these factors work to some degree in Mayes's favor. We hold that the district court's action produced a fundamentally unfair result, and that Mayes's due-process rights were violated by the district court's actions." *Id.*

The Court continued discussing the issues and noted that "the multiplicity of fact patterns and considerations convinces us that there are no ready bright-line rules that we can use to solve this case." *Id.* In so concluding, this Court rejected the 9th Circuit's view in *People v. Materne*, 72 F.3d 103, 107 (9th Cir. 1995) that "there can be no reasonable expectation of finality as to sentences that are illegal." This Court concluded that

> [u]nder this view, the fact that there was no basis for the original district court to suspend Mayes's sentence would mean that Mayes could have no expectation of finality. We are unable to agree with such a bright-line rule, and even if we did agree, this expectation of finality would have to be balanced against other factors. We agree, however, that in ordinary circumstances the illegality of a sentence is a weighty factor to consider, and that this makes us reluctant to eliminate Mayes's sentence altogether.

*Id.* The Court, therefore, remanded the case for the district court to consider "whether some sort of intermediate sentence or mitigated arrangement is appropriate." *Id.* at *6.

### III.

The basic principle, it seems, is that "the power of a sentencing court to correct even a statutorily invalid sentence must be subject to some temporal limit." *Breest v. Helgemoe*, 579 F.2d 95, 101 (1st Cir. 1978). Thus, "[a]fter a substantial period of time, therefore, it might be fundamentally unfair, and thus violative of due process for a court to alter even an illegal sentence in a way which frustrates the prisoner's expectations." *Id.*; *see also Lundien*, 769 F.2d at 987 ("[D]ue process may also be denied when a sentence is enhanced after the defendant has served so much of his sentence that his expectations as to its finality have crystallized and it would be fundamentally unfair to defeat them."). And, the First and Fourth Circuits were discussing *prisoners* still *currently* incarcerated when their sentences are enhanced.[3] Lummie Sanders had been living as a free man for *six and a half years*.

In any event, I would follow the lead of the First Circuit and this Court in *Mayes* and look at all of the facts and circumstances and also loosely apply the multi-factor test. I find it troubling that the majority did not cite or consider our decision in *Mayes*. Although the case is an unpublished

---

[2] The Court did note that "Mayes's changed circumstances — his new success in life — add nothing to our calculus. A poorer man of equal scruples should face an identical chance of having his sentence reiterated. If Mayes's success in life means that other people depend on him for their livelihood, the executive branch of the government is fully equipped to consider this factor in deciding how and whether to pursue Mayes." *Id.* at *5.

[3] As the First Circuit noted, "[w]hen a prisoner first commences to serve his sentence, especially if it involves a long prison term as here, the prospect of release on parole or otherwise may seem but a dimly perceived, largely unreal hope. As the months and years pass, however, the date of that prospect must assume a real and psychologically critical importance. The prisoner may be aided in enduring his confinement and coping with the prison regime by the knowledge that with good behavior release on parole or release outright will be achieved on a date certain." *Id.* at 101. In *Breest*, the court found, however, that the trial court's increase of a sentence from eighteen to forty years after the defendant had served fourteen days to be "permissible." *Id.*

disposition, it was issued by a unanimous panel adopting an analysis that would be directly applicable here.  In any event, once again, the First Circuit in *DeWitt* found that "attention must be given . . . to the lapse of time between the mistake and the attempted increase in sentence, to whether or not the defendant contributed to the mistake and the reasonableness of his intervening expectations, to the prejudice worked by a later change, and to the diligence exercised by the state in seeking the change." *DeWitt*, 6 F.3d at 35.  Likewise, in *Mayes*, this Court, in answering "the core due-process question: Was it too late for the district court to reiterate [the defendant]'s sentence, such that doing so was fundamentally unfair," we found the *DeWitt* factors to be useful.

        The first factor is "the lapse of time between the mistake and the attempted increase in sentence." *DeWitt*, 6 F.3d at 35 (finding the delay from when DeWitt was released from prison in January 1987 to September 1987 when he was rearrested, a delay of six months, to be "lengthy").  In *Mayes*, this Court found "the five-year span between iteration and reiteration of [the defendant]'s sentence [] problematic."  162 F.3d 1162, *4.  In this case, the time span is more than *six* years — longer than the time span in *Mayes*.  I think this six year lapse of time is also "problematic."

        The second factor is "whether or not the defendant contributed to the mistake and the reasonableness of his intervening expectations." *DeWitt*, 6 F.3d at 35.  As this Court found in *Mayes*, Sanders too "did not contribute at all" to the errors committed here. *Mayes*, 162 F.3d 1162, *4.  In *Mayes*, this Court found that Mayes's "expectations were not wholly reasonable, [but] they were still reasonable enough."  *Id.*  Mayes had received conflicting information — both that his sentence was suspended, but also that he would be notified by the clerk's office to report to the halfway house to serve his sentence.  Mayes was never notified and never brought the error to the attention of the Court.  I would not suggest that Sanders's expectations were one hundred percent reasonable, but they come pretty close, and are far more reasonable than those accepted by this Court in *Mayes*.  Sanders was released from prison.  He completed two years of supervised release. He was notified by the federal government that his supervised release was completed and his service of his sentence was finished.  Sanders awoke over the course of two thousand mornings without any information to the contrary.  Sanders had no conflicting information like Mayes.

        The third factor is "the prejudice worked by a later change." *DeWitt*, 6 F.3d at 35.  In *Mayes*, where the reiterated sentence would have required Mayes to report to a halfway house for six months, this Court found that "the prejudice faced by Mayes is harsh, though not as harsh as if he were being sent to prison (or, *a fortiori*, being sent *back* to prison like DeWitt)."  162 F.3d 1162, *5 (emphasis in original).  Thus, the prejudice here is *far worse* than in *Mayes*.  Sanders would be sent *back to prison* — and not for some short six month term, but rather nearly *eleven years* — which this Court has already stated was harsher than what *Mayes* would have to endure.  Furthermore, the prejudice to Sanders cannot be fully appreciated without reference to what he did with his settled and crystalized expectations that his incarceration was finished.

        Sanders was released from custody on April 28, 1998.  He immediately sought out a residence in Cleveland and reported this address to the Probation Department.  He secured employment though Area Temp Services and on April 30, two days after his release, was hired at Alco Molding Co., making molds for trains and airplane parts.  He remained employed there for six months making $10 per hour.  His employment was terminated when he suffered a broken arm while working a machine.  After approximately six months, he returned to work on modified duty doing light industrial and clerical work at The Reserves Network in Cleveland.  During this same time period, Sanders also worked a second job as an evening cook at Jacobs Field.  Area Temps also sent him to other short time positions.

        Sanders purchased and registered an automobile.  He registered to vote and has voted in every election since his release.  In May 1998, Sanders joined the New Bethlehem Baptist Church

in Cleveland and served as an usher until his re-arrest. Sanders also reunited his family upon release in 1998. During his incarceration several of his children became involved in drug activity. He became actively involved in his children's lives, encouraged them to find employment with Area Temps and met with and counseled his children on a regular basis — all of whom are now drug free, employed, and members of his church.

Sanders also reestablished a relationship with his thirteen-plus grandchildren. He also became romantically involved with another church member, Shalonda Ellison, and, on March 6, 2003, after three years of dating, they married. Shalonda has two daughters of her own who were being raised by their grandparents. Sanders also began a relationship with Shalonda's daughters.

As part of his commitment to his family — which Judge Dowd was aware of in 1993 — every weekend Sanders had all of his grandchildren to his house to stay with him. Sanders also began to include Shalonda's family and this established strong familial bonds between the families. Sanders and Shalonda also enrolled and attended parenting classes sponsored by Child Services at the Family Health of Beech-Brook program, at the Carl B. Stokes building in Cleveland. Sanders also has asserted that Shalonda was pregnant at the time of his re-arrest on December 23, 2003, and that she miscarried that night.

In January 1999, Sanders secured full-time employment as a Service Technician, at the Longwood Estates, through the Cleveland Metropolitan Housing Authority. He remained employed there for two years. On May 30, 2001, Sanders joined Labors International Union of North America, Local 860, Construction Member #3879113. He worked for Local 860 through December 2002 when he was involved in a serious work related accident while working construction at Kokosing Construction Co. Sanders was hit with a piece of iron and lost his right eye. He was unable to work in 2003 due to the injury and was placed on Social Security Disability.

On March 17, 2003, Sanders was able to completely pay off all past due child support obligations to the Cuyahoga Support Enforcement Agency. And, on a regular basis, approximately once per week, Sanders would accompany his brother, Charles Sanders, a Deacon with the Deacon Christian Fellowship Mission, in Cleveland, to minister and counsel to inner city children. The First Circuit in *DeWitt* focused on the "new roots in society, acquiring a job and reestablishing family ties" during the eight *months* during which DeWitt was released from prison. *DeWitt*, 6 F.3d at 35. Sanders, of course, laid new roots in society, acquired a job, and reestablished family ties, during the six *years* during which he was released.[4]

Sanders, it appears, made quite a life for himself. He exemplified rehabilitation at its best. The prejudice in this case is unfathomable.

---

[4]The district court made a very interesting point in its answer to the mandamus action which I would be remiss in not addressing. The district court discussed the United States Department of Justice policy of considering "collateral consequences" when deciding whether to indict *corporations*. Judge Dowd commented on a lecture he attended where the former Deputy Attorney General "indicated that he had considered 'collateral consequences' in his decision not to seek an indictment of the corporations Enron and WorldCom because of the 'collateral consequences' to the shareholders and other entities that would have been adversely affected, in his opinion." Judge Dowd stated that "collateral consequences" appears to be "a concept limited to corporations and not individuals."

This case presents an example of how bizarre and inhumane such a policy is. Apparently the prosecutor did not give a second thought to what would happen "to the shareholders and other entities that would have been adversely affected" in Lummie Sanders's life. Apparently considerations such as these are a blessing bestowed upon corporations but not individuals and families. So, too bad so sad for Eric, Nicole, Ronald, Carmen, Kim, Shelly, Lummie, Cedric, Malanie. This case begs the question whether prosecutors are really deserving of the discretion they are afforded. "The greatest dangers to liberty lurk in insidious encroachments by men of zeal, well-meaning, but without understanding." *Olmstead v. United States*, 277 U.S. 438, 573 (1928) (Brandeis, J., dissenting).

The fourth factor is "the diligence exercised by the state in seeking the change." *DeWitt*, 6 F.3d at 35. In *Mayes*, this Court found that the government displayed a "total lack of diligence" in pursuing the matter. 162 F.3d 1162, *5. Such is the case here as well. The prosecutor seeks to blame the district court, but in my opinion, both are at fault. Moreover, it does not matter from the due process perspective which branch of the government is at fault if Sanders's due process rights are violated. *See Mayes*, 162 F.3d 1162, *5 ("We hold that the *district court's* actions produced a fundamentally unfair result, and that Mayes's due process rights were violated by *the district court's actions*." (emphasis added)). Thus, it does not matter whether the prosecutor or the district court or both produced the fundamentally unfair *result* — because it is the *result* that matters. I would therefore reject the prosecutor's attempt at playing the blame game. And, in any event, both the prosecutor and the district court are at fault. The district court admitted its reluctance to send Sanders back to prison. Following this Court's reversal of the district court's grant of habeas relief, the federal government's probation department sent Sanders a notice of discharge, which, it is clear, was incorrect. Even more troubling is the fact that for the next *fourteen months* the prosecution did nothing. Even more troubling than that is that following the government's eventual request that Sanders be arrested, nobody did *anything* for *nineteen more months* — or, approximately five hundred and fifty days. By the time the government renewed its request that Sanders be arrested, he had then been out of prison for *five years and two months*. These lengthy delays — fourteen months and nineteen months respectively — demonstrate a lack of diligence on the part of the government. Following the government's renewed request, the district court did not act again for another *six* months (albeit due to reluctance rather than diligence). After Sanders was arrested and papers were filed, the district court did nothing again for *six* more months with nearly another year passing from the time of the arrest to the time the district court acted again. I would therefore find that the district court's actions in reimposing Sanders's sentence "produced a fundamentally unfair result, and that [Sanders]'s due process rights were violated by the district court's actions." *Mayes*, 162 F.3d 1162, *5.

By applying this four prong test, all of the factors weigh heavily in favor of Sanders and they all indicate that a due process violation has occurred. This Court continued the analysis in *Mayes*, however, by acknowledging that it still must consider the fact that the mistaken sentence was illegal. *Id.* ("We agree, however, that in ordinary circumstances the illegality of a sentence is a weighty factor to consider."). The Court determined, therefore, that the expectation of finality would have to be balanced against the sentence's illegality. Still, the Court found that Mayes's expectation of finality outweighed the illegality of the sentence. With all of the factors above weighing even more heavily in the direction of a fundamentally unfair result and due process violation, I would reach the same conclusion in Sanders's case.

## IV.

When I think about this case, as I have done so often as of late, it makes me sick to my stomach. To imagine the emotional and psychological turmoil Mr. Sanders has been forced to endure as a result of the government's action and inaction in this case shocks and angers me to no end. Sanders woke up every day for six years believing that he was a free man. That's 2,190 mornings. And, in this case, it appears that Lummie Sanders used each of those days to make something out of his life. I cannot imagine any more settled expectations than those. I would order Sanders released from prison immediately. If we as a federal court cannot remedy the truly fundamentally unfair result that exists here, I don't know what good we are. And the law, well, if the law truly requires Lummie Sanders to go back to prison — the law is a ass.[5]

---

[5] CHARLES DICKENS, OLIVER TWIST 520 (Dodd, Mead & Co.1941) (1838).