RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0321p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 06-1556

CLARENCE HOWARD BROWN,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-80101—Arthur J. Tarnow, District Judge.

Argued: July 25, 2007

Decided and Filed: August 16, 2007

Before: COLE and GILMAN, Circuit Judges; MARBLEY, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Chokwe Lumumba, c/o CURTIS WILLIAMS, Detroit, Michigan, for Appellant. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Chokwe Lumumba, c/o CURTIS WILLIAMS, Detroit, Michigan, for Appellant. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

### OPINION

_____

R. GUY COLE, Jr., Circuit Judge. Defendant-Appellant Clarence Howard Brown appeals his federal conviction for kidnapping, transportation of a minor with intent to engage in criminal sexual activity, and sex trafficking of children. Brown contends that pre-arrest delay violated his due-process rights and that post-arrest delay before trial violated his speedy-trial rights. Because Brown is not entitled to relief, we **AFFIRM**.

---

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

# I. BACKGROUND

In October 2001, the victim, thirteen-year-old Tiffany Bender, met nineteen-year-old Mack Atkins at a high-school football game in Adrian, Michigan. Tiffany lived with her grandmother because her mother was a drug addict and unable to care for her. On November 9, 2001, Tiffany told her grandmother that she was going to spend the night with her girlfriend, but she went out with Atkins. Atkins picked Tiffany up at her house, and they spent the night at Atkins's father's house. The next day, they went to Atkins's aunt's house where Tiffany met Atkins's cousin, twenty-eight-year-old Defendant-Appellant Brown. Later, Brown and Atkins attempted to drive Tiffany home in Brown's car, but it developed mechanical problems, so they went to Brown's sister's house in Ypsilanti, Michigan, where they spent the night. There, Tiffany met Brown's girlfriend, Holly Hollis, and her six-year-old son.

The following day, Tiffany accompanied Brown, Atkins, Hollis, and her son to Barkeyville, Pennsylvania. Over the next few days they stayed at motels, and Hollis would leave for a few hours at a time. Tiffany assumed, based on Hollis's appearance, that Hollis engaged in prostitution at these times. On November 13, the group spent the night at Brown's brother's house. Tiffany then unsuccessfully tried to reach her mother by phone. She again spent the night at Brown's brother's house.

The next day, Hollis told Tiffany that Brown would take Tiffany home. Brown, Tiffany, Hollis and Hollis's son—but not Atkins—later got into Brown's car, and Tiffany thought she was going home. When she noticed that they had been driving for too long, she asked Brown if he knew where he was going, and he told her to "shut up" and that she "was his bitch." (Joint Appendix ("JA") 304.) Rather than drive Tiffany home, Brown drove to a Motel 6 in Fort Wayne, Indiana. Hollis later left the motel to engage in prostitution at a nearby truck stop. Meanwhile, Brown loaded a gun in front of Tiffany in the motel room, and, that night, he raped her.

The next day, when Tiffany asked why Brown made Hollis prostitute herself, Brown hit Tiffany and told her she "was going to be doing it soon." (JA 307.) Hollis helped Tiffany dress and put on makeup and accompanied her to the truck stop. Hollis told Tiffany that Tiffany was in "whore training," and Hollis instructed her on the "rules" of prostitution and what to charge for sexual favors. (JA 309–310, 327.) Hollis borrowed a trucker's CB radio to "advertise" herself. (JA 309.) That night, with the customers' permission, Hollis had Tiffany watch her perform sexual activities with eleven different "dates." (JA 310.)

The following day, they followed the same routine, except that Brown directed Tiffany to engage in prostitution as well. Brown gave Tiffany condoms to use. Tiffany's first "date," a truck driver, refused to allow Hollis to observe. The driver then held a knife to Tiffany and threatened to perform anal sex on her. When she cried and said she was only fourteen years old, he threw her out of his truck, and she went back to the motel. When Hollis returned, Brown hit her and yelled at her for leaving Tiffany alone. That night, Brown raped Tiffany again.

The next day, Hollis and Tiffany returned to the truck stop. That night, Tiffany engaged in prostitution with about ten men. When she returned to the motel, she gave all the money she earned to Brown. Hollis explained to Tiffany that Hollis had to earn more than Tiffany because Hollis was the "top whore" and Tiffany was the "bottom whore." (JA 319.) They both engaged in prostitution activity for about a week, from approximately November 21 through November 27, 2001. On one occasion, Hollis and Tiffany told the motel desk clerk about their business and the prices they would charge. The desk clerk noted that when Tiffany was in Brown's presence she appeared terrified, and Tiffany told the clerk that she feared she might not make it home.

On November 27, a female truck driver, Peggy Jones, let Hollis and Tiffany into her truck to use the CB radio. When Hollis eventually left the truck, Tiffany started crying and told Jones that she wanted to go home. Jones let Tiffany ride in her truck, and on December 1, 2001, they arrived at the New Jersey border and called Tiffany's mother. Jones stayed with Tiffany until the police arrived. The police brought Tiffany to the police station and then to a safe house for children, where she stayed until her mother arrived and eventually drove her home to Michigan.

Around December 14, 2001, Tiffany provided Michigan police with a fourteen-page, hand-written statement describing these events. On January 11, 2002, she gave an oral statement to the FBI. Three days later Tiffany gave the police a paper bag with twelve condoms that Brown gave her.

Approximately three years passed before Brown was arrested in January 2005. At that time, Brown admitted that Atkins was his cousin and that Hollis had been Brown's girlfriend, but Brown claimed that he had not seen Hollis since late 2001. Brown also denied knowing Tiffany. At first, he denied ever traveling with the group to Pennsylvania, but he later admitted staying in Pennsylvania with Atkins, Hollis, her son, and a "young white female." (JA 558–63.)

On February 2, 2005, a grand jury returned an indictment charging Brown and Hollis with kidnapping, in violation of 18 U.S.C. §§ 1201(a) & (g), and transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a). On April 20, 2005, the grand jury added a third count against both defendants of sex trafficking of children, in violation of 18 U.S.C. § 1591.

Brown's trial commenced on November 8, 2005. The jury convicted him on all three counts. On April 3, 2006, the district court sentenced Brown to concurrent 240-month terms on counts one and three, and a sixty-month consecutive sentence on count two. Brown timely appealed.

## II. DISCUSSION

Brown contends that his rights were violated by the delay between both (1) the crime and his arrest, and (2) his arrest and trial. The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend VI. In *United States v. Marion*, 404 U.S. 307, 321 (1971), the Supreme Court held that the Sixth Amendment's speedy-trial guarantee, which explicitly refers to "the accused," does not apply until an individual is arrested or indicted. Before that time, due-process rights protect against oppressive delay. *Id.* at 324. We address first Brown's claim regarding pre-arrest delay and then address his claim regarding post-arrest delay.

### A.    Pre-Arrest Delay

Brown first contends that the three-year delay between the crime and his arrest violated his due-process rights. We review de novo this claim, which raises a mixed question of law and fact. *United States v. Sanders*, 452 F.3d 572, 576 (6th Cir. 2007) (citing *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001)).

As a threshold matter, Brown has waived this argument. Federal Rules of Criminal Procedure 12(b)(3)(A) & (B) provide that motions alleging a defect in instituting the prosecution or in the indictment "must be raised before trial." Rule 12(e) provides that failure to do so constitutes a waiver of those objections. Fed. R. Crim. P. 12(e). This Court "strictly applies Rule 12(b), and has repeatedly held that failure to raise 12(b) motions in a timely fashion precludes appellate review." *United States v. Oldfield*, 859 F.2d 392, 396 (6th Cir. 1988). Brown never moved to dismiss the indictment based on delay. His argument on appeal is therefore waived. *See id.*; *see also United States v. Pinson*, 1 F. App'x 426, 429 (6th Cir. 2001) ("As [the appellant] moved

to dismiss based on pre-indictment delay after the trial began, appellate review of the matter is waived.").

In any event, this argument also lacks merit. After holding that the Sixth Amendment does not apply to pre-arrest delay, the *Marion* Court explained that "'the applicable statute of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges.'" 404 U.S. at 322 (quoting *United States v. Ewell*, 383 U.S. 116, 122 (1966) (alteration in original)). Brown does not allege that the three-year delay before charges were brought against him violates the statute of limitations, which has a ten-year duration. *See* 18 U.S.C. § 3283. The *Marion* Court noted, however, "that the statute of limitations does not fully define [a person's] rights with respect to the events occurring prior to indictment." 404 U.S. at 324. The Court explained that due-process protections "would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *Id.*

"Thus *Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *United States v. Lovasco*, 431 U.S. 783, 790 (1977). We have interpreted *Marion* and *Lovasco* to hold that both conditions (improper reasons for delay and prejudice) are necessary for a due-process violation. *Sanders*, 452 F.3d at 581 n.6. When assessing whether these conditions are met, we are "to determine only whether the action complained of . . . violates those fundamental conceptions of justice [that] lie at the base of our civil and political institutions, and [that] define the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790 (internal citations and quotation marks omitted); *Sanders*, 452 F.3d at 580. Brown fails to meet either condition.

First, Brown offers no proof that the delay was a deliberate ploy by the Government to gain a tactical advantage. Brown merely states, without support, that the delay demonstrates that the authorities' "motive was to neutralize [Brown's] ability to build a defense." (Brown's Br. 18.)

Second, Brown fails to show that the delay prejudiced him so gravely that his due-process rights were violated. He says that Atkins, who died before trial and "possibly before [Brown's] arrest," "would have been in a position to describe the relationship[,] if any existed[,] between Mr. Brown and . . . Tiffany . . . ." (*Id.* 18.) The record does not reveal when Atkins died. But even assuming that Atkins would have provided information regarding the relationship between Brown and Tiffany, that information would not have significantly aided Brown's defense because Atkins was not present when Brown took Tiffany in his car and therefore was not present for any of the events underlying the charges. *Cf. United States v. Rogers*, 118 F.3d 466, 476 (6th Cir. 1997) (holding that defendant failed to show prejudice where witness died before trial and it was "unlikely that his testimony would have affected the outcome of the trial").

Brown additionally alleges that the delay prejudiced him by causing him to forget certain events, and this "was used to his disadvantage at trial to make it appear that [he] was trying to hide important facts when he was interviewed by the FBI." (Brown's Br. 18.) The Government responds that this point is irrelevant because Brown chose not to testify. (Gov't Br. 17.) But a defendant's exercising of his right not to testify should not automatically eliminate any argument that a delay-induced lack of memory prejudiced his defense—especially where that delay arose from improper motives of the Government. Yet Brown's contention here nonetheless fails because his inability to recall certain facts in the interview did not affect the ultimate outcome of the trial.

In sum, Brown fails to establish a due-process violation for his pre-arrest delay.

**B.       Post-Arrest Delay**

Brown also challenges the post-arrest delay, alleging violations of his speedy-trial rights under (1) the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161–74, and (2) the Sixth Amendment.

1.       *Speedy-Trial Act*

Brown contends that the approximately nine-month delay between his indictment on February 3, 2005, and his trial, which began on November 8, 2005, violated the Speedy Trial Act. The Act generally requires a federal criminal trial to begin within seventy days after a defendant is charged or makes an initial appearance, 18 U.S.C. § 3161(c)(1), but the Act contains a detailed scheme under which certain specified periods of delay are not counted. *Zedner v. United States*, __ U.S. __, 126 S. Ct. 1976, 1981–1982 (2006). "If a trial does not begin on time, the defendant may move, before the start of trial or the entry of a guilty plea, to dismiss the charges, and if a meritorious and timely motion to dismiss is filed, the district court must dismiss the charges, though it may choose whether to dismiss with or without prejudice." *Id.* at 1984. "In making that choice, the court must take into account, among other things, 'the seriousness of the offense; the facts and circumstances of the case [that] led to the dismissal; and the impact of a reprosecution on the administration of [the Act] and on the administration of justice.'" *Id.* (quoting § 3162(a)(2)) (second alteration in original).

The Act also provides that "[f]ailure of the defendant to move for dismissal prior to trial . . . shall constitute a wavier of the right to dismissal under this section." 18 U.S.C. § 3162(a)(2); *United States v. White*, 985 F.2d 271, 274–75 (6th Cir. 1993) ("By failing to raise this [Speedy Trial Act] issue until the appeal, White waived the right to make this argument."). Brown never raised this claim before trial. Brown notes only that, under *Zedner*, a defendant "may not *prospectively* waive the application of the speedy trial act." (Brown's Br. 19 (emphasis added).) But *Zedner* explains that "there is no reason to think that Congress wanted to treat prospective and retrospective waivers [such as Brown's] similarly" under the Act. 126 S. Ct. at 1986. The Court explicitly stated that "a defendant whose trial does not begin on time is deemed to have waived the right to move for dismissal of the information or indictment if he or she does not file that motion prior to trial or entry of a guilty plea." *Id.* at 1981. Brown's claim is therefore waived.

2.       *Sixth Amendment*

Brown next contends that the nearly ten-month delay between his arrest on January 13, 2005, and his November 2005 trial violates the Sixth Amendment's speedy-trial guarantee. Unlike the Speedy Trial Act, which protects against delay from the time of indictment or appearance, the Sixth Amendment protects against delay from the time of *arrest* when it precedes the indictment or appearance. *See Dillingham v. United States*, 423 U.S. 64, 65 (1975) (measuring delay for Sixth Amendment claim from time of arrest and noting that "[i]nvocation of the speedy trial provision . . . need not await indictment, information, or other formal charge").

In determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, we review questions of law de novo and questions of fact under the clearly-erroneous standard. *United States v. Jackson*, 473 F.3d 660, 664 (6th Cir. 2007) (internal quotation marks and citation omitted). The remedy for a Sixth Amendment speedy-trial violation is dismissal with prejudice. *Id.* (citation omitted).

The Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), established a four-factor test for evaluating a Sixth Amendment speedy-trial claim: (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. None of these four factors is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other

circumstances as may be relevant." *Id.* at 533. Applying these factors here shows that Brown's speedy-trial rights were not violated.

### a.     *Length of Delay*

The first factor, length of the delay, is a triggering mechanism: "Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *Doggett v. United States*, 505 U.S. 647, 651–52 (1992).

The nearly ten-month delay here is likely right at the line to trigger an analysis of the remaining factors. "This Court has found that a delay is presumptively prejudicial when it approaches one year." *United States v. Gardner*, __ F.3d __, 2007 U.S. App. LEXIS 12203, at *42 (6th Cir. May 25, 2007) (citing *United States v. Schreane*, 331 F.3d 548, 553 (6th Cir. 2003)). And although we have indicated that an eight-month delay would suffice to meet this first factor, *see, e.g., Jackson*, 473 F.3d at 665 (quoting law-review article cited in *Doggett* that states "[t]here seems general agreement that any delay of eight months or longer is 'presumptively prejudicial'"), we have also held that a delay of approximately nine months was not presumptively prejudicial, at least where the matter involved "multiple defendants and pre-trial motions," *see Gardner*, 2007 U.S. App. LEXIS 12203, at *42. Here, we will assume without deciding that the nearly ten-month delay is presumptively prejudicial and address the remaining factors, which, as discussed below, outweigh this presumption.

### b.     *Reason for Delay*

"Closely related to length of delay is the reason the government assigns to justify the delay." *Barker*, 407 U.S. at 531. Different weights should be assigned to different reasons. *Id.* "A deliberate attempt to delay the trial . . . to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* A valid reason, "such as a missing witness, should serve to justify appropriate delay." *Id.*

Moreover, a court should consider whether some of the delay is attributable to the defendant. *See, e.g., United States v. Bass*, 460 F.3d 830, 837 (6th Cir. 2006) ("[I]t is apparent that the government was not any more to blame than [the defendant] for this delay . . . ."). Although the Government here suggests that delay attributable to Brown should be considered under the first factor (by simply subtracting from the total length of the delay)—an approach we have taken before, *see, e.g., Norris v. Schotten*, 146 F.3d 314, 327 (6th Cir. 1998)—commentators have pointed out that this approach is "inconsistent with *Barker*," where the Supreme Court simply looked to the total period between arrest and trial to assess the first, length-of-delay factor. *See* 2 David Rudstein et al., Criminal Constitutional Law ¶ 11.01[1] & n.88 (2006) (citing *Norris* as an example of the improper approach). The proper analysis, which we recently employed in *Bass* and employ here, is to consider delay attributable to the defendant under the second, reason-for-delay factor.

Here, the reasons for the delay weigh against finding a Sixth Amendment violation. First, the charges were complex, involving multiple defendants and including kidnapping, transportation of a minor with the intent to engage in criminal sexual activity, and sex trafficking of children. *Cf. Bass*, 460 F.3d at 836 ("Delays due to the complexity of the case and the large number of defendants support a finding that no Sixth Amendment violation occurred."). And, as the Government noted at oral argument, the investigation here involved corroborating Tiffany's description of the events through witnesses in multiple states. Second, although the burden of excusing delay rests with the

Government, *see* Rudstein et al., *supra*, ¶11.01[1] & n.155 (citing *Barker*, 407 U.S. at 531), "it cannot be presumed that the government acted with an improper motive," *id.* ¶11.01[1], and there is no indication that the delay was motivated by the Government's bad faith or attempt to gain tactical advantage. Third, much of the delay here is attributable to Brown. For example, in May 2005 Brown sought new counsel and stated in open court that he had no objection to the delay required by the "extra time" new counsel would need to prepare for trial. (JA 99.) Brown then obtained a stipulation to adjourn a status conference from July 7, 2005, to July 26, 2005, so that he could have another new counsel substituted as his attorney on that later date. In short, the reasons for delay do not weigh toward a conclusion that the delay violated Brown's rights.

### c.     *Defendant's Assertion of His Right*

"The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531–32. The *Barker* Court "emphasize[d] that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 532. As discussed above, Brown never asserted his speedy-trial rights before this appeal. This factor therefore weighs heavily toward a conclusion that no Sixth Amendment violation occurred. Indeed, in *Barker*, the Supreme Court concluded that the more than *five-year* delay between arrest and trial there did not amount to a constitutional violation in part because of the lack of prejudice to the defendant but, "*[m]ore important* than the absence of serious prejudice, [was] . . . that *Barker did not want a speedy trial*." *Id.* at 534 (emphasis added). Similarly, Brown—who waited four years less than Barker for trial—also was apparently unconcerned with how speedily it arrived.

### d.     *Prejudice*

The fourth factor, prejudice to the defendant, "should be assessed in light of the interests of defendants [that] the speedy trial right was designed to protect." *Id.* at 532. The Supreme Court in *Barker* identified three of these interests: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired. *Id.* "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

Whatever prejudice exists here is minimal. First, no prejudice arose from Brown's pretrial incarceration because even if he had not been detained in this case, he would have been in state custody for two felony armed-robbery cases pending in Mississippi and a felonious-assault case in Michigan. Second, any anxiety or concern Brown experienced here for ten months would fall short of that deemed insufficiently prejudicial in *Barker*, where the defendant waited more than five years from arrest to trial. *Barker*, 407 U.S. at 533–34. Third, as discussed above with regard to Brown's due-process claim, Brown's contentions regarding Atkins's death and his own memory lapses fall short of establishing the sort of prejudice that triggers Sixth Amendment protection. *Cf. Bass*, 460 F.3d at 838 ("Bass . . . does not state what testimony any missing witnesses could have provided, which witnesses' memories were affected, or how his own memory problems affected his defense.").

\*                    \*                    \*

On balance, the *Barker* factors show that Brown's speedy-trial rights were not violated. Indeed, as discussed, he never even asserted those rights at trial. Accordingly, no Sixth Amendment violation occurred.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.