**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0366n.06

**Nos. 09-5500 and 09-6200**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

***Apr 05, 2012***

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | On Appeal from the United |
| | ) | States District Court for the |
| v. | ) | Western District of Tennessee |
| | ) | |
| MICHAEL FLOWERS, aka Michael Partee (09-5500), | ) | O P I N I O N |
| DERRICK BENTON (09-6200), | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE: McKEAGUE and WHITE, Circuit Judges; BARRETT, District Judge.[*]

**McKeague, Circuit Judge.** Defendant-Appellant Derrick Benton ("Benton") and Defendant-Appellant Michael Flowers ("Flowers") were both charged with distributing six grams of cocaine base in violation of 21 U.S.C. § 841 ("Count One") and possessing a firearm in furtherance of that charge in violation of 18 U.S.C. § 924(c) ("Count Two"). Benton was also charged with five additional violations of 21 U.S.C. § 841. Benton and Flowers ultimately pleaded guilty to all counts except for Count Two. After a jury convicted both defendants of Count Two, Benton and Flowers were sentenced to 120 and 152 months imprisonment, respectively.

On appeal, Benton and Flowers both challenge their conviction for Count Two, arguing insufficient evidence. In addition, Benton claims that his Sixth Amendment right to a speedy trial

---

[*] The Honorable Michael R. Barrett, United States District Judge for the Southern District of Ohio, sitting by designation.

was violated, and Flowers charges that the district court erred in refusing to grant him a two-level

reduction in his base offense level for acceptance of responsibility.  We **AFFIRM** the district court

in all respects.

## I.  BACKGROUND

Factual Background

On June 2, 2006 at 3 a.m., Detective Ian James and his confidential informant ("CI") visited

Benton and Flowers to purchase drugs.  Detective James was an undercover police officer with the

Memphis Police Department, and his CI had reported that Flowers and Benton "do most of their

business around this time, and it would be a good time to go ahead and meet them and make a

purchase." Trial Tr. at 267-68.

When Detective James and his CI knocked on the door, they were greeted by Benton.  Once

inside, Detective James told Benton that they had come to purchase "a quarter ounce of heart"—a

rock form of cocaine—and the men agreed upon a price of $150.  *Id.* at 273-75.  Detective James

testified about the following interaction between Benton and Flowers:

> Mr. Benton went to the back room of this one-bedroom apartment.  For a couple of
> moments he was out of my sight.  A short while after that he comes back to the front.
> That's when I give him my $150.  He goes back to the back . . . Benton goes back
> and forth through the living room a couple of times.  On one occasion he comes to
> the living room, and he has a firearm in his right hand.  He comes to the right side of
> Michael Flowers and hands it off to him.  Michael Flowers then chambers a round
> or it appears that he chambers a round and places it in his right pocket.

*Id.* at 276-77.  Flowers then offered his telephone number for Detective James with "the butt of the

firearm, the handgrip, out of his pocket," making it both visible and quickly available.  *Id*. at 283.

After Flowers gave Detective James his telephone number, Benton returned to the room and weighed

the cocaine. *Id*. Once Detective James verified the weight of the drugs, he left the apartment with the drugs and his CI. *Id*.

Detective James recorded the drug deal on a concealed video camera. At trial, Detective James testified that he was "displeased with the fact that [he] caught everything on camera except the gun," which was "just below the actual viewing of the camera." *Id*. at 288. He explained, however, that the need to ensure the recording device was not detected had made it impossible for him to adjust the video or monitor the camera's angle during the transaction. *Id*. at 286-87.

Detective James also testified that Benton and Flowers exchanged the gun "right in front of [him]," *id*. at 277, and that his experience as an undercover police officer spanned approximately 350 drug deals, many of which involved firearms. *Id*. at 278. In addition, Officer James testified that he believed Benton and Flowers were sending him the message that "it's the middle of the night, 3:00 a.m., they didn't know [him], they weren't going to get robbed . They had fire power." *Id*. at 281. Officer James also testified that Benton and Flowers had both pled guilty to their participation in the drug transaction depicted in the video that was played for the jury. *Id*. at 285-89; 292-95.

After the jury returned a guilty verdict on Count Two, the court ordered a Presentence Report ("PSR") on Benton and Flowers to facilitate sentencing. The PSR did not recommend a reduction in either Benton's or Flowers's base offense level for acceptance of responsibility pursuant to the United States Sentencing Guidelines ("U.S.S.G.") § 3E1.1. Flowers objected, and the district court overruled his objection on the grounds that Flowers's decision to go to trial on Count Two signified that he did not wholeheartedly admit to the relevant conduct for those counts in which he pleaded guilty. (R.E. 205, April 17, 2009 Sentencing Transcript, 18-21.)

Procedural Background Regarding Benton's Speedy Trial Claim

Benton was indicted on July 18, 2006, and 904 days passed before his trial began on January 6, 2009. On February 7, 2008, Benton filed a pro se motion for a speedy trial. In addition, Benton filed a second pro se motion requesting exculpatory material. In denying Benton's second pro se motion, the district court explained that Benton's motions violated local court rules because he was represented by counsel and not proceeding pro se. As such, the district court instructed the clerk not to accept further pro se motions from Benton. Ultimately, Benton was convicted after a one-day trial.

Over the course of the 904-day lapse, Benton requested a continuance on 21 occasions. Two continuances were requested in order for Benton's rotating cast of counsel to get up to speed. Additionally, two continuances were requested to accommodate defense counsel's schedule, and one was requested because of the medical condition of one of defense counsel's family members. Defense counsel also requested additional time on four occasions due to difficulty accessing the Government's discovery materials. Three requests for additional time were made as a result of defense counsel's ongoing negotiations with the Government. Finally, Benton and his counsel requested additional time without further explanation on nine other occasions. All of the motions to continue and requests for additional time were granted by the district court with no objection from the Government.

For its part, the Government requested two continuances because of scheduling conflicts. One of the Government's motions to continue resulted in supplanting Benton's previously-scheduled trial date with a suppression hearing. The second motion to continue caused a 24-day delay by

moving the trial date from December 12, 2008 to January 5, 2009.  The district court granted both

of the Government's motions with no objection from Benton.

## II.  ANALYSIS

### A.  Benton and Flowers's Sufficiency of the Evidence Claim

Standard of Review and Relevant Law

A district court's denial of a defendant's motion for acquittal based on insufficient evidence

is reviewed de novo.  *United States v. Mabry*, 518 F.3d 442, 447-48 (6th Cir. 2008).  The

Constitution "prohibits the criminal conviction of any person except upon proof of guilt beyond a

reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 309 (1979), and we must "view the evidence

in the light most favorable" to the Government, determining whether any "rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.  Toward that

end, we review all evidence and resolve "all reasonable inferences in favor of the government."

*United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007).  Further, "it must be remembered that

circumstantial evidence alone can sustain a guilty verdict and such evidence need not remove every

reasonable hypothesis except that of guilt." *Id.*  (internal quotations and alterations omitted).  As

such, "[t]his standard is a great obstacle to overcome and presents the appellant in a criminal case

with a very heavy burden." *Id.*  (internal citations omitted).

Analysis

The Defendants argue that the Government produced insufficient evidence to convict them

of Count Two.  The statute at issue in Count Two provides that any person "who, in furtherance of

[a drug trafficking] crime, possesses a firearm, shall, in addition to the punishment provided for . .

. [the] drug trafficking crime . . . be sentenced to a term of imprisonment of not less than 5 years . . . ." 18 U.S.C. § 924(c)(1)(A)(i).

"To prove the possession was 'in furtherance of' the drug trafficking crime, the Government must show a 'specific nexus between the gun and the crime charged' and that the firearm 'was strategically located so that it is quickly and easily available for use.'" *United States v. Ham*, 628 F.3d 801, 808 (6th Cir. 2011) (citing *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001)) (internal citations and quotations omitted). Other relevant factors include: "(1) whether the gun was loaded, (2) the type of weapon, (3) the legality of its possession, (4) the type of drug activity conducted, and (5) the time and circumstances under which the firearm was found." *Id.* at 808-09.

This Court has considered whether a defendant possessed a firearm "in furtherance of" a drug trafficking crime on multiple occasions. In *Mackey*, "there was an illegally possessed, loaded, short-barreled shotgun in the living room of the crack house, easily accessible to the defendant and located near the scales and razor blades." 265 F.3d at 462. The defendant was "stopped by police near the gun, possessed cocaine and a large sum of cash," and as a result, "a reasonable jury could infer that the purpose of the firearm was to provide defense or deterrence in furtherance of the drug trafficking for which defendant was arrested." *Id.* at 462-63.

In *Swafford*, this Court affirmed a defendant's conviction for violating 18 U.S.C. § 924(c) where the defendant possessed a .45 caliber pistol that "was strategically located so that it was quickly and easily available for use. The gun was found loaded, with its handle pointing up, within arm's reach of the bed where [the defendant] was lying." *United States v. Swafford*, 385 F.3d 1026, 1029 (6th Cir. 2004). The *Swafford* Court noted that the firearm was a semiautomatic, and

considered the Drug Enforcement Administration ("DEA") Agent's trial court testimony that "such weapons play a role in drug distribution, as dealers carry them for protection and intimidation purposes." *Id*. The *Swafford* defendant was also a convicted felon, rendering his possession of the gun unlawful. *Id.* "Finally, the gun was discovered as the officers executed a search warrant looking for drugs, which they ultimately found." *Id.*

Most recently, in *Ham*, this Court affirmed a defendant's conviction for possessing a firearm "in furtherance of" his drug offenses when the defendant possessed a "loaded 9 mm pistol . . . located about head-high on top of an armoire situated just outside the closet where the drugs were found." *Ham*, 628 F.3d at 809. The *Ham* Court observed multiple similarities to *Swafford*:

> Similar to the DEA Agent's testimony in *Swafford*, Agent Lewis testified that persons involved in drug trafficking almost always have guns because "it's an illegal business, and the only way they can protect this illegal business is through violence or the threat of violence." Like *Swafford*, Defendant could not lawfully possess a handgun because he was a convicted felon. Also, as in *Swafford*, "the gun was discovered as the officers executed a search warrant looking for drugs, which they ultimately found." The nexus between the offense and gun is even stronger than in *Swafford* because the gun was found in closer proximity to the drugs, i.e., in the same room. We conclude that a rational trier of fact could have found beyond a reasonable doubt that Defendant possessed a firearm in furtherance of a drug trafficking offense.

*Id.* (internal citations and alterations omitted).

The evidence against Benton and Flowers in this case reveals an even closer nexus between the gun and the crime charged than in *Mackey*, *Swafford*, and *Ham*. Here, Officer James observed both Benton and Flowers in physical possession of the firearm during the drug trafficking offense. Further, whereas the firearm in *Mackey*, *Swafford*, and *Ham* was merely "strategically located," the firearm in this case was actively passed between Benton and Flowers. Much like in *Ham* and

*Swafford*, Officer James testified that Benton and Flowers brandished the firearm to establish their firepower and prevent a possible robbery.

Benton and Flowers both rely heavily on the fact that Officer James's video does not depict a firearm and they claim that the sound of racking the gun is absent. Yet Officer James provided a reasonable explanation as to the poor quality of the video, and his testimony provided adequate grounds for convicting Benton and Flowers of Count Two in light of *Mackey*, *Swafford*, and *Ham.* The verdict indicates that the jury credited Officer James's testimony and gave it more weight than the video. In this context, Benton and Flowers do not meet their heavy burden of demonstrating that the evidence, considered in the light most favorable to the government, fails to support their conviction. Because a rational trier of fact could have found that Benton and Flowers possessed a firearm based on Officer James's testimony, their insufficiency-of-the-evidence claim fails.

**B. Benton's Sixth Amendment Speedy Trial Claim**

Standard of Review and Applicable Law

In assessing whether a defendant's Sixth Amendment right to a speedy trial was violated, this Court reviews questions of law de novo and questions of fact for clear error. *United States v. Brown*, 498 F.3d 523, 530 (6th Cir. 2007). The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." The Supreme Court has established a four-factor test for evaluating a Sixth Amendment speedy trial claim: (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). None of these four factors constitutes "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather,

they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533. "The remedy for a Sixth Amendment speedy-trial violation is dismissal with prejudice." *United States v. Brown*, 498 F.3d 523, 530 (6th Cir. 2007). We examine each factor in turn.

      a.     *Length of the Delay*

The first factor is "actually a double enquiry." *Doggett v. United States*, 505 U.S. 647, 651 (1992). We begin by determining whether there is a delay that triggers a speedy trial analysis. *Id.* at 651-52. "Delay is measured from the date of indictment or the date of arrest, whichever is earlier, to the date of trial." *United States v. Brown*, 169 F.3d 344, 349 n.3 (6th Cir. 1999) (citaiton omitted). A delay that approaches one year is "presumptively prejudicial," and triggers a speedy trial analysis. *Doggett*, 505 U.S. at 652 n.1. Once speedy trial analysis is triggered, the "court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id.* This Circuit has held that the "strength of th[e] presumption [of prejudice] grows as the length of that delay extends." *United States v. Graham*, 128 F.3d 372, 376 (6th Cir. 1997). Further, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531.

Here, Benton was indicted on July 18, 2006, and his trial began on January 6, 2009. The Government concedes that the 904-day lag between indictment and trial triggers the speedy trial analysis but argues that the facts of this case are sufficient to rebut the presumption of prejudice. Gov't Br. at 29. Specifically, the Government contends that "[i]n *Doggett* the length of delay at

issue was eight and a half years, and in *Mundt*, the delay at issue was three and a half years. In comparison, the two year and six month delay in the instant case is comparatively brief." Gov't Br. at 30. The Government also asserts that "the statute of limitations for the offenses for which Benton was charged in 2006 is five years. Therefore, the United States arguably could have waited until 2011 before presenting Benton's case to the Grand Jury." *Id.* at 30-31.

We find that the Government failed to rebut the presumption of prejudice. First, this case bears little resemblance to the facts in either *Doggett* or *Mundt*. In *Doggett*, the Supreme Court found a speedy trial violation where the 8 ½ years passed between a defendant's indictment for a cocaine conspiracy and his arrest. *Doggett*, 505 U.S. at 648-50. In *Mundt*, the Sixth Circuit found no speedy trial violation where the defendant knew he was under investigation by the Internal Revenue Service but was not arrested for over three years because the Government was "reasonably diligent." *Mundt*, 29 F.3d at 236. In contrast to both *Doggett* and *Mundt*, Benton was incarcerated for 902 of the 904 days between the indictment and trial. Further, Benton's crime was more straightforward than the cocaine conspiracy at issue in *Doggett* or the tax evasion at issue in *Mundt*.

Second, the Government's assertion that "the relatively short length of delay in the instant case argues against a finding that the level of 'presumptive prejudice' should result in dismissal," Gov't Br. at 30, is not supported by precedent or even common sense. Once the defendant has passed the one-year threshold a presumption of prejudice automatically inheres, and time above and beyond the one-year mark strengthens the presumption of prejudice. *Graham*, 128 F.3d at 376.

Finally, the Government's argument regarding the statute of limitations is beside the point. The statute of limitations for a crime is inapposite in speedy trial analysis, which examines "the

interval between accusation and trial." *Doggett*, 505 U.S. 647; *see also United States v. MacDonald*, 465 U.S. 1, 6 (1982) (explaining that "the Speedy Trial Clause of the Sixth Amendment does not apply to the period before a defendant is indicted, arrested, or otherwise officially accused."). Accordingly, the Government's point that it could have waited until 2011 before presenting Benton's case to the Grand Jury does nothing to rebut the presumption of prejudice in this case.

      b.      *Reason for the Delay*

As the Supreme Court explained:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531. This spectrum reflects the reality that "pretrial delay is often both inevitable and wholly justifiable." *Doggett*, 505 U.S. at 656. As with the first *Barker* factor, this factor involves a two-step inquiry: first, determine which party bears the primary responsibility for the delay. Second, where the Government is at fault for the delay, this Court must determine how much weight to assign this factor. While simple negligence does not automatically compel relief, "neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him." *Id*. at 657 (granting relief where "[t]he lag between Doggett's indictment and arrest was 8 ½ years, and he would have faced trial 6 years earlier than he did but for the Government's inexcusable oversights" in failing to diligently pursue him upon his return to the United States).

Here, the Government argues that the vast majority of the delay "was attributable to the defendant because of various continuances requested by Benton's counsel, the withdrawal of original trial counsel due to a conflict, the withdrawal of subsequent trial counsel due to the breakdown of the attorney-client relationship, and the appointment of and preparation by new counsel in each instance." Gov't Br. at 31. In support of this argument, the Government cites to *United States v. Robinson*. 455 F.3d 602, 608 (6th Cir. 2006) (upholding the district court's attribution of the majority of the 17-month delay to the defendant "because of various continuances requested by defendant's counsel, the withdrawal of defendant's original counsel due to defendant's complaints concerning the breakdown of their relationship, the appointment of new counsel, and defendant's requests for additional time to file a supplemental memorandum in support of his motion to dismiss").

While Benton acknowledges that he requested numerous continuances, he argues that he only did so because the Government "either failed to provide complete discovery or because the discovery from the government was defective." Benton's App. Br. at 21. As such, Benton argues that the delay caused by the continuances is properly charged against the Government.

There is support for Benton's position in Supreme Court precedent. In *Barker*, the Supreme Court noted: "The government, and for that matter, the trial court are not without responsibility for the expeditious trial of criminal cases. The burden for trial promptness is not solely upon the defense." 407 U.S. at 527 n.27. In *Vermont v. Brillon*, 556 U.S. 81, 94 (2009), the Supreme Court explained that "institutional problems" and other "[d]elay resulting from a systemic breakdown . . . could be charged to the State."

Similarly, this Circuit has held that dilatory district court action may justify granting a defendant's speedy trial claim. In *Graham*, this Court granted a defendant's speedy trial claim when the district court took eight years to resolve a discovery dispute, finding that "much of the blame for the delay . . . [fell] on the government and on the district court." 128 F.3d at 375. Similarly, in *Maples v. Stegall*, this Court concluded that "[u]ltimately, as in *Graham*, the responsibility for . . . delays in this case must rest with the trial court" because the trial court "failed to assert itself in an attempt to move the process along." 427 F.3d 1020, 1028 (6th Cir. 2005) (internal alterations omitted). In sum, both the prosecutor and the district court bear an affirmative responsibility to ensure an expeditious trial process.

In this case, the district court dutifully held regular status conferences. At the same time, we find it striking that—even though the district court characterized this as a "straightforward case" from the very beginning—the district court granted 23 continuances to the parties over the course of 904 days. Moreover, many of these continuances were granted as a result of persistent problems, such as defense counsel's inability to access discovery materials. In addition, the district court failed to rule on the Defendant's motion to suppress. Finally, the district court ignored Benton's pro se motion asserting his speedy trial rights, citing local court rules, and instructed the Clerk of Court to ignore subsequent motions from Benton.

We do not find this record "automatically tolerable," *Doggett*, 505 U.S. at 657, but we also do not believe that it merits relief. The vast majority of the continuances were requested by Benton; only two were requested by the Government. Even if we accept Benton's argument that the prosecution was to blame for many of these continuances because of technical difficulties with the

discovery, the Government aptly noted that "there was never a motion to compel discovery of any kind filed in this case, nor a complaint regarding discovery violations made by any of the three of Benton's trial counsel directed at the government." Gov't Br. at 33. Accordingly, while we are disconcerted by the 904-day lapse, we cannot say that the Government and the district court are "more to blame for the delay." *Maples*, 427 F.3d at 1026.

     c.     *Defendant's Assertion of Speedy Trial Right*

The third factor considers whether the defendant effectively asserted his speedy trial right. Context is critical: "The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences." *Barker*, 407 U.S. at 531.

Here, Benton most clearly asserted his speedy trial right in his pro se motion entitled "Defendant's Assertion of His Speedy Trial Rights." The record also reveals additional instances where Benton asserted his speedy trial right. For example, in his pro se motion for discovery, Mr. Benton again revisited his request for a speedy trial: "Because you set me a trial date for April after you[] received my Speedy Trial Motion, I thought I was going to be set for a trial date when I went to video court March 28, 2008 . . . I have been trying to go to trial for a long time." R.E. 138 at 21. Significantly, the district court recognized that Benton was attempting to assert his constitutional right to a speedy trial; at the December 1, 2008 status conference, the district court noted: "Mr. Benton says he has reached his limit. This case has been pending over a year now and he's ready to go to trial." Tr. 12/1/08, p. 3.

The Government argues that "[t]here was no motion filed by any of Benton's trial counsel asserting a violation of Benton's right to a speedy trial under the Sixth Amendment." Gov't Br. at 33. The Government continues: "Benton's 'assertion of his rights' before the district court was made through his filing of a *pro se* motion, in violation of local rules . . ." *Id.* The Government fails to cite to the local rule that Benton violated, however, and Benton's reply brief aptly notes that "[t]here is no citation because there is no such local rule." Benton's Reply, p. 17. Further, the Government's argument fails to address the heart of the *Barker* inquiry, which asks this Court to consider the strength of the defendant's assertion of his speedy trial rights.

We find that the timing of Benton's *pro se* motion calls into question whether Benton vigorously asserted his rights. Although Benton was indicted on July 18, 2006, he first mentioned that he wanted a speedy trial on August 30, 2007, and he waited until February 7, 2008 to file his motion for a speedy trial. Although the district court failed to explicitly rule on Benton's request, other courts have found that a delay of fifteen months in asserting speedy trial rights weighs against a defendant. *Robinson*, 455 F.2d at 608. Here, Benton waited at least twelve months and arguably seventeen months before requesting a speedy trial. Accordingly, the belated nature of Benton's request for a speedy trial "cast[s] doubt on the sincerity of the demand," *Brown*, 169 F.3d at 350, and this factor weighs in favor of the Government.

### d.     *Prejudice to the Defendant*

Finally, we consider whether the defendant was prejudiced "in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker*, 407 U.S. at 531. Toward that end, the Supreme Court has identified three relevant interests: "(i) to prevent oppressive pretrial

incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id*. The Supreme Court does not require the defendant to offer "affirmative proof of particularized prejudice" because "time's erosion of exculpatory evidence and testimony can rarely be shown." *Doggett*, 505 U.S. at 655 (internal quotations omitted).

The Government argues that "Benton has shown no tactical advantage gained by the Government from the delay, and Benton has failed to demonstrate any specific prejudice to his case stemming from the delay." Gov't. Br. at 34. This argument is both factually inaccurate and beside the point. The record reveals that Benton did offer affirmative proof of particularized prejudice, even though he was not required to do so. *See Doggett*, 505 U.S. at 655. Most notably, Benton expressed significant anxiety during his incarceration as well as concern regarding his health. R.E. at 3 ("Being in this situation is destroying me mentally and physically and the reason for that is because I have never been to jail and I have seizures and I am a diabetic.").

    e.    *Remedy*

As the above analysis indicates, Benton satisfied each of the four *Barker* factors to varying degrees. The Government correctly argues, however, that "<u>even</u> a finding in the defendant's favor on <u>each</u> of the four *Barker* factors does not necessarily warrant a dismissal of the indictment, because a dismissal is required only when the court finds that a defendant's constitutional right to a speedy trial has been violated." Gov't Br. at 34 (quoting *Brown*, 169 F.3d 348). Ultimately, satisfying the *Barker* factors does not constitute "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533.

Ultimately, we conclude that Benton was not deprived of his speedy trial right. A violation

of the right to a speedy trial only arises when "the circumstances of the case are such that further

delay would endanger the values the right protects." *Barker*, 407 U.S. at 522. In this case, the

Government's negligence does not amount to malfeasance, much of the delay is attributable to

Benton's own actions, and the core of the Sixth Amendment right remains protected because Benton

neither timely nor vigorously asserted his claim.

## C. Flowers's Sentencing Claim

Standard of Review and Applicable Law

A district court's determination regarding acceptance of responsibility is reviewed with "great

deference" and will only be disturbed if it is "clearly erroneous." *United States v. Webb*, 335 F.3d

534, 538 (6th Cir. 2003); *see also* U.S. Sentencing Guidelines Manual § 3.E.1.1(a) cmt. n.5 (2010).

U.S.S.G. § 3.E1.1(a) provides that, "[i]f the defendant clearly demonstrates acceptance of

responsibility for his offense, decrease the offense level by 2 levels." The application notes to

U.S.S.G. § 3.E1.1(a) instruct:

> In determining whether a defendant qualifies under subsection (a), appropriate
> considerations include, but are not limited to, the following: truthfully admitting the
> conduct comprising the offense(s) of conviction, and truthfully admitting or not
> falsely denying any additional relevant conduct for which the defendant is
> accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required
> to volunteer, or affirmatively admit, relevant conduct beyond the offense of
> conviction in order to obtain a reduction under subsection (a). A defendant may
> remain silent in respect to relevant conduct beyond the offense of conviction without
> affecting his ability to obtain a reduction under this subsection. However, a
> defendant who falsely denies, or frivolously contests, relevant conduct that the court
> determines to be true has acted in a manner inconsistent with acceptance of
> responsibility . . . .

U.S. Sentencing Guidelines Manual § 3.E.1.1(a) cmt. n.1 (2010). Additionally, the notes make clear

that "[a] defendant who enters a guilty plea is not entitled to an adjustment under this section as a

matter of right." *Id.* at cmt. n.3. Although entering a plea agreement before trial can constitute

"significant evidence" that a defendant has accepted responsibility, the application notes caution that

"this evidence may be outweighed by conduct of the defendant that is inconsistent with such

acceptance of responsibility." *Id.*

In this case, the district court carefully considered the merits of Flowers's request for a

downward departure. The court then reasoned:

> Now, what happened is he came in, pled to two of the counts, [and] we went to trial
> . . . on the other count, the last count. And that means the government was put to its
> proof. It wasn't put to its proof in quite the same way it would have been otherwise,
> but I doubt that the trial was materially shortened because you have to put on all the
> proof of Count 1 to get to Count 2. That's the truth of the matter . . . . My problem
> really is this. When you look at 31.1, [Flowers] has clearly demonstrated acceptance
> of responsibility for his offense. And it's somewhat complicated when you have
> acceptance for some counts but not others. And then you get to 1A. There has to be
> a truthful admission for a no-fault denial of additional relevant conduct which the
> defendant is accountable. *In this case it's more than relevant conduct. It's a count
> for which he was convicted.* That's the problem. You with me?

Sentencing Tr. at 17-19 (emphasis added). Accordingly, the district court determined that Flowers

did not earn a two-level downward departure because his behavior was inconsistent with accepting

responsibility. *Id.* at 21.

At sentencing, Flowers denied wrongful conduct—possessing a firearm—for which he was

convicted. In turn, the district court reasoned that Flowers's possession of a firearm was a linchpin

for effectuating the drug deal that animated the plea agreement. Accordingly, the district court's

reasoning mirrors the approach counseled by the application notes. *See* U.S. Sentencing Guidelines

Manual § 3.E.1.1(a) cmt. n.1 (2010) ("a defendant who falsely denies . . . relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility . . ."). Thus, the district court's determination was not clearly erroneous.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court in all respects.

**HELENE N. WHITE, Circuit Judge**, concurring.

I concur in the majority opinion except as to section II.C., concerning Flowers's acceptance-of-responsibility claim, as to which I concur in the result only. I do not understand the district court to have exercised its discretion under § 3E1.1(a), and in exercise of that discretion, to have determined that an adjustment was not warranted. Rather, I understand the court to have determined that § 3E1.1(a) did not permit a two-level reduction under these circumstances.[1]

Although there is good reason to question this legal determination,[2] I concur in the affirmance

---

[1]Although the majority is correct that the district court's application of §3E1.1(a) to the specific facts of a case is entitled to "great deference" and reviewed for clear error, it is also indisputably true that we review de novo a district court's interpretation of the Guidelines. *United States v. Anglin*, 601 F.3d 523, 526 (6th Cir. 2010); *see also United States v. Tilford*, 224 F.3d 865, 867 (6th Cir. 2000); *United States v. Garrido*, 596 F.3d 613, 617 (9th Cir. 2010) ("We review de novo whether the district court misapprehended the law with respect to the acceptance of responsibility reduction.").

[2]Application note 1(a) provides, "[i]n determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following: truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional <u>relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)</u>." (emphasis added). The application notes plainly state that relevant conduct is assessed according to § 1B1.3. In turn, § 1B1.3 provides that relevant conduct for purposes of "adjustments in Chapter Three" shall be determined based on, among other things, "offenses of a character for which § 3D1.2(d) would require grouping of multiple counts."

Based on the interplay between these provisions, several circuits have held that a district court retains discretion to apply the acceptance-of-responsibility reduction when a defendant pleads guilty to all "grouped" charges but nevertheless contests the factual basis of a § 924(c) charge. *See Garrido*, 596 F.3d at 619 (9th Cir. 2010) ("We join our sister circuits in holding that, where a defendant accepts responsibility for all counts that are grouped under U.S.S.G. §§ 3D1.1-3D1.5, that defendant is eligible for the § 3E1.1 reduction for those counts, even if the defendant has not accepted responsibility for other counts which, under § 3D1.1(b), are excluded from grouping."); *United States v. Hargrove*, 478 F.3d 195, 200 (4th Cir. 2007) ("[U]nder the terms of U.S.S.G § 3E1.1, the defendant must only accept responsibility for the grouped guidelines counts in order to be eligible for the reduction in offense level for that particular 'offense.'"); *United States*

nevertheless because the record of the sentencing proceeding makes clear that the district court was

determined to, and did in fact give, Flowers what it felt was appropriate credit for having accepted

responsibility for the two drug counts. The Guidelines as calculated yielded a range of 100-125

months, with a mandatory five-year consecutive sentence for the § 924(c) conviction. If the

calculations had included a two-level reduction for acceptance of responsibility for the grouped

offenses, Flowers's Guidelines range would have been 84-105 months. Flowers's counsel argued

for an 84-month sentence. In discussing whether to vary from the 100-125- month range, the district

court engaged in a thorough examination of the offenses and Flowers's background, concluding that

the sentencing factors would cause it to sentence at the bottom of the guidelines. The court then

explained that application of the Guidelines did not result in an appropriate sentence because the

calculation did not take into account Flowers's acceptance of responsibility for Counts 1 and 8. The

court then granted a variance that it thought adequately recognized the acceptance of responsibility,

---

*v. Wattree*, 431 F.3d 618, 622 (8th Cir. 2005), *abrogated on other grounds, as stated in United States v. Anderson*, 618 F.3d 873, 880 (8th Cir. 2010); *United States v. Williams*, 344 F.3d 365, 380 (3d Cir. 2003). Our decision in *United States v. Chambers*, 195 F.3d 274 (6th Cir. 1999) is not contrary to these decisions. In fact, the *Chambers* court agreed that "U.S.S.G. §1B1.1 directs courts to group convictions *prior* to applying an adjustment for acceptance of responsibility." 195 F.3d at 278-79 (emphasis added). The basic rationale is that the Guidelines dictate that in a multi-count conviction, convictions must be 'grouped' before determining the base-offense level. *See* U.S.S.G. § 3D1.1(a)(1). Specifically excluded from grouping are charges that carry a statutory mandatory-minimum term of imprisonment that runs consecutively to any Guidelines sentence. *Id.*; § 3D1.1(b) & cmt. 1. Since the acceptance of responsibility is a two-level reduction in the base-offense level, it makes little sense that the acceptance-of-responsibility determination turn on a non-grouped offense. Because § 924(c) carries an automatic, consecutive mandatory-minimum sentence, it is not grouped and therefore not factored into the base-offense level at all. Thus, the district could have, but was not obliged to, grant a two-level reduction under § 3E1.1(a).

and imposed concurrent 92-month sentences for Counts 1 and 8. Because it is clear that the court

would have imposed the same sentence without regard to how it scored § 3E1.1(a), I concur in the

majority opinion.